RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0167p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JANE DOE,

　　　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

UNIVERSITY OF KENTUCKY,

　　　　　　　　　　　*Defendant-Appellee*.

No. 22-6012

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:15-cv-00296—Gregory F. Van Tatenhove, District Judge.

Argued:  October 19, 2023

Decided and Filed:  August 7, 2024

Before:  BATCHELDER, GRIFFIN, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Linda M. Correia, CORREIA & PUTH, Washington, D.C., for Appellant.  Bryan H. Beauman, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, for Appellee.  **ON BRIEF:**  Linda M. Correia, Andrew Adelman, CORREIA & PUTH, Washington, D.C., for Appellant.  Bryan H. Beauman, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, William E. Thro, UNIVERSITY OF KENTUCKY, Lexington, Kentucky, for Appellee.  Jim Davy, ALL RISE TRIAL & APPELLATE, Philadelphia, Pennsylvania, Sean Ouellette, PUBLIC JUSTICE, Washington, D.C., for Amici Curiae.

　　　　BLOOMEKATZ, J., delivered the opinion of the court in which GRIFFIN, J., joined. BATCHELDER, J. (pp. 26–56), delivered a separate dissenting opinion.

---

**OPINION**

---

BLOOMEKATZ, Circuit Judge.  The University of Kentucky held not one, not two, not three, but four student conduct hearings after Jane Doe reported that a student raped her in her dorm room on campus. Each of the first three resulted in expulsions or long-term suspensions for the accused, but the University's appeals board overturned each determination for procedural deficiencies.  After the third reversal, Doe filed a Title IX lawsuit against the University for its actions in response to the rape.  Then, in the fourth hearing—nearly two-and-a-half years after Doe first reported the rape—the hearing panel flipped and ruled against her.  Doe now claims that the University mishandled her fourth hearing in retaliation for her lawsuit.  The University moved for summary judgment and the district court granted the motion, concluding that Doe could not state a prima facie case of retaliation under Title IX.  Because the district court's decision rests on several legal errors and the record shows that a reasonable juror could find Doe established a prima facie case, we reverse and remand.

**BACKGROUND[1]**

Jane Doe was a student in a dual enrollment program between Bluegrass Community and Technical College and the University of Kentucky.  That program allowed Doe to take classes at the community college and transfer those credits toward a bachelor's degree at the University. While taking classes as part of this program, Doe lived in a University dormitory.

Doe alleges that John Doe (JD) raped her in her dorm room on October 2, 2014.  At the time, JD was a student at the University and a member of its football team.  Doe previously dated JD and ended the relationship the month prior to the alleged rape.  Within hours of the alleged rape, Doe reported it to her roommate, her mother, and the University police.  Officer Laura

---

[1]Because we are reviewing a grant of summary judgment in favor of the University, we recite the facts in the light most favorable to Doe, the non-moving party.  *Palma v. Johns*, 27 F.4th 419, 423 (6th Cir. 2022).

Sizemore responded to the call and escorted Doe to the University's hospital, where Doe underwent a sexual assault examination.[2]

Officer Sizemore and Detective Vaun Brannock investigated the incident and concluded that JD raped Doe. They memorialized their findings in a police report. Given the result of the officers' investigation, the University issued JD an interim suspension and ordered him not to contact Doe.

*First Hearing.* Following its Title IX policy, the University scheduled a student conduct hearing on the matter. The hearing occurred within a week of the reported rape and was adjudicated by a panel composed of faculty members. JD could not attend and submitted a written statement instead.

The day after the hearing, the panel issued a decision finding that JD raped Doe and permanently expelled him. JD, represented by counsel, appealed the decision and prevailed. The appeals board found that the panel erred by conducting the hearing without JD present, so the decision could not stand, and the hearing had to be redone.

*Second Hearing.* The University held a second hearing two weeks after the reversal. Doe did not attend the second hearing, explaining that she did not want to risk being retraumatized. Instead, the University used her recorded statements from the first hearing in addition to her police report. A few days later, the second panel found JD responsible and, like the first, expelled him from the University.

JD then appealed the second hearing panel's decision and the appeals board again reversed. It ruled that the second panel committed two fatal procedural errors: First, the panel should not have allowed Doe's recorded statement from the first hearing because, in its view, the statement was irrevocably tainted. Given JD's absence from the first hearing, the appeals board ruled that the recorded "testimony from that date [was] not admissible, barring extraordinary circumstances." In re JD Letter, R. 140-30, PageID 2161. Second, Doe and her roommate's absence from the hearing denied JD the ability to cross-examine witnesses.

---

[2]The exam detailed Doe's account of the alleged rape. The examiner observed lacerations on Doe's shoulder and back.

*Third Hearing.* The University held a third hearing on March 26, 2015—six months after the alleged incident occurred. Doe participated telephonically from another location on campus. The third hearing panel issued a report finding JD responsible and suspended him for five years.

Once again JD appealed, and once again the appeals board found that the panel committed procedural errors that warranted reversal. This time, the panel erred in allowing Officer Sizemore and Detective Brannock to testify in each other's presence, which violated the University's rule that witnesses be excluded from the hearing except for the period of their testimony.

*Fourth Hearing*. In June 2015, the University asked for Doe's availability for a fourth hearing that would take place the next month. A series of back-and-forth scheduling communications followed. At first, Doe requested an August date. Around the same time, JD dropped out of the University. Because Doe planned to reenroll in the fall, she asked the University to suspend the proceedings until then. The University refused, but it also did not schedule a hearing. By August, Doe had hired a new attorney who informed the University that Doe would provide her availability for a fourth hearing once she decided whether she would participate. Doe's lawyer further asked the University to keep her updated on JD's availability. Both parties claim to have been waiting for a response from the other, and neither followed up about scheduling the hearing. Meanwhile, Doe enrolled in a different college unrelated to the University of Kentucky.

On October 1, 2015, Doe filed a complaint in federal court against the University for deliberate indifference to sex discrimination, in violation of Title IX. Because of this lawsuit, the University paused all proceedings (though it had yet to schedule the fourth hearing). It claims that it believed Doe's complaint sought to enjoin the proceedings, even though the complaint only requested "[i]njunctive relief to be determined at trial requiring UK to comply with federal law under Title IX." Compl., R.1, PageID 11. Several months later, in her opposition to the University's motion to dismiss, which she filed on January 27, 2016, Doe faulted the University for failing to schedule a hearing. The next day, the University emailed Doe and her counsel seeking to schedule the fourth hearing. Doe's counsel responded that she was coordinating with

Doe and Doe's mental health provider, and she again stated that the University should let her know when JD provided dates.  The University did not follow up.

Nearly eight months after this exchange, the district court issued an order denying the University's motion to dismiss and criticizing it for failing to schedule a fourth hearing.  As a result, the University sent a letter to Doe and JD about scheduling a hearing between September 15, 2016, and October 15, 2016.  JD requested a late October hearing and the University agreed.

Doe alleges that the Title IX coordinator was required to hold pre-hearing meetings with both Doe and JD.  The pre-hearing meeting is an opportunity for the involved parties to discuss the hearing process, receive input, and attempt to resolve the matter without conducting a hearing.  But the University failed to perform the meeting leading up to the fourth hearing despite having done so before each of the prior hearings.  The University says that it did not hold a prehearing meeting because it was unlikely that the parties would resolve the issue given the result of the three prior hearings.

On the morning of the hearing, the University canceled last-minute.  Professor Robert G. Lawson, the hearing officer, said the hearing could not go forward that day because JD's attorney raised due process concerns about the composition of the hearing panel, although he did not say what the concerns were.  Doe and the University corresponded about several potential dates in November and December for a hearing.  Finally, in late December, the University rescheduled the fourth hearing for early January 2017.

At the hearing, the University was responsible for presenting the case against JD. University 30(b)(6) Depo., R. 140-5, PageID 2019 (admitting that the University's role was to "present the best case to prove that the [University] policy had been violated").  Because Doe was diagnosed with post-traumatic stress disorder after the alleged assault and was hospitalized for this condition after the third hearing, she requested that she not be required to again recount her rape to the panel.  The University arranged for Doe's recorded direct testimony from the third hearing to play for the panel and for Doe to be available for live cross-examination remotely from her attorney's office.  The University told Doe and her counsel that they were allowed to object during the hearing.  Prior to the hearing, Doe was provided a list of witnesses

that would testify on her behalf, including Officer Sizemore.  Doe had specifically requested Officer Sizemore's presence.

On January 10, 2017, the University held the fourth hearing.  On the morning of the hearing, Doe was informed that Officer Sizemore was not available to attend the hearing because she was on FMLA leave, so her testimony would be conveyed only via the police report.  That concerned Doe because Officer Sizemore could have testified to matters beyond the police report, including that Doe's statements to police were consistent and that her behavior after the assault was consistent with having been raped.  Furthermore, the hearing panel permitted JD to use Doe's recorded statements from the first hearing to impeach her despite the appeals board having previously ruled that the statements from the first hearing were inadmissible in any later proceeding.  The University representative did not object to the use of the recorded statements— indeed, he did not make *any* objections throughout the hearing.  Over Doe's objections, the University representative allowed JD to ask questions about her federal lawsuit to "explore her motivations."  Fourth Appeal Report, 140-40, PageID 2223.  Professor Lawson, responsible for screening and asking the cross-examination questions JD submitted, asked whether Doe had "filed a federal court lawsuit against the University of Kentucky for monetary damages related to [her] claim of having been assaulted by [JD] while living on UK campus" and whether she was "concerned that if [JD was] not found responsible," that result "could have a negative effect" on her lawsuit.  Hearing Tr., R. 140-48, PageID 2502.

Nine days later, as the panel deliberated, Doe's counsel received two messages from an anonymous source alleging that the University of Kentucky Police Chief, Joseph Monroe, obstructed Officer Sizemore from testifying at the fourth hearing.  The source stated that Chief Monroe kept Officer Sizemore from testifying by suggesting that she had to go home for childcare duties.  The anonymous source alleged that the hearing administrators were told that Officer Sizemore was on family medical leave when she wasn't.  Moreover, Officer Sizemore might have testified if not approached by Chief Monroe.  Doe's counsel described, but did not share, the messages in an email to a Title IX coordinator at the University, who notified other University administrators but not the hearing panel.  The coordinator also called Officer Sizemore to confirm the police department's stated reason for her absence by asking her if she

was indeed at home providing childcare on the day of the hearing. The coordinator then asked Officer Sizemore whether anyone told her not to attend the hearing. Officer Sizemore, interpreting the question to be about threats, said no. The coordinator did not inquire whether Chief Monroe told her about the hearing or ask if she could have been available to testify as requested. The coordinator did not mention the allegations about Chief Monroe or even allude to the existence of the anonymous messages.

Unbeknownst to Doe at the time, Officer Sizemore would have made accommodations to testify, but she wasn't asked to attend. As discovery revealed, the University had waited until the Friday before the Tuesday hearing to request Officer Sizemore's attendance from the University police department. Chief Monroe in turn did not approach Officer Sizemore until the day before the hearing. And, according to Officer Sizemore, Chief Monroe never told her about Doe's hearing and the University's request to have her testify. Instead, Chief Monroe vaguely asked her to confirm generally that she did not have childcare and would therefore be unavailable the next day. Sizemore Depo., R. 140-1, PageID 1987 (explaining that Chief Monroe told Sizemore that her "childcare issues" was "all [he] needed to know" so she "couldn't be somewhere if [she] needed to be").

Officer Sizemore only realized that Doe's hearing was happening the next day because Officer Eric Scott mentioned to her that Chief Monroe told him he "needed to attend" the hearing. Sizemore Mem., R. 140-25, PageID 2131. Officer Scott, whom JD called to testify on his behalf, served as the police liaison for, and traveled with, the football team. Officer Scott planned to testify that JD called him after the rape allegation, denied doing it, and asked Scott for advice. While Officer Scott was initially unable to testify "due to other commitments," Chief Monroe made arrangements so that Officer Scott could attend. Monroe Email, R. 131-33, PageID 1900.

Officer Sizemore stated she was confused as to why Officer Scott—who had no investigative role in the alleged rape—was going to attend, but her attendance was not required even though she was the lead investigator on the case. If she had received proper notice of the hearing, she could have made accommodations to attend. Feeling misled, Officer Sizemore sent a memo to her police captain memorializing the prior conversation with Chief Monroe. She also

told Detective Brannock that she felt lied to and deceived about her ability to testify. While Officer Sizemore testified that the police report included all the relevant facts, she also stated that it did not include her perspective of whether Doe was a credible witness, and further, she could have offered her opinion on whether certain pieces of evidence were relevant to whether Doe had been raped.

Meanwhile, the fourth hearing panel issued its decision, finding that JD was not responsible for the alleged misconduct. The hearing panel based its decision on Doe's credibility versus JD's. The panel gave seven reasons why it found JD's story more plausible and Doe not credible. First, it noted that Doe testified that on the day of the attack, she retrieved JD from the lobby of her building when security footage showed him waiting in front of the building's exterior—that is, just outside the lobby. Second, it said Doe's claim that she did not witness JD take his clothes off in her dorm room was doubtful because, even though Doe testified that she was focused on her computer and finishing a paper, pictures of the dorm room showed that it was too small for her not to notice him removing his clothes. Third, Doe escorted JD out of the building in a different outfit than the one she wore when she entered with JD; but in testimony, Doe stated that JD removed her pants and made no mention of her shirt. The panel inferred from the lack of testimony regarding a shirt that Doe had changed her shirt and that it was not consistent with rape to change in front of an attacker. Fourth, video evidence showed that Doe talked to the respondent for some time after signing him out of the dorm. This conduct struck the panel as inconsistent with an allegation that rape had occurred. Fifth, Doe corresponded with JD after the alleged rape via text. One text from Doe read, "I wish you the best."**3** Fourth Panel Report, R. 140-34, PageID 2182. Sixth, the photos taken at the hospital did not clearly show biting, restraining, or force used against her. Finally, Doe stated that she did not know JD had a girlfriend, but in recorded testimony from the first hearing, Doe stated she did not want to be a second girlfriend. For unexplained reasons, the panel did not include Officer Sizemore's police report in the list of evidence it considered in coming to its conclusion (though the report had been read at the hearing); it only included the police report JD presented (and the University

---

**3**We note that many text messages in front of the hearing panel also show that Doe evinced resentment toward JD. For example, she told him twice to "delete [her] number and don't call [her]." Hearing Evidence, R. 131-1, PageID 1579.

stipulated to), which was from Officer Scott.  Nor did the panel explain why it disagreed with the investigators' conclusion that, based on their experience with campus rape, experience with sexual assault, and review of all the evidence following the allegation, JD raped Doe.  The panel also did not directly answer whether sexual activity occurred and whether it was consensual.

Doe appealed the hearing panel's decision.  Doe argued that the panel allowed irrelevant questions attacking her for bringing a Title IX lawsuit, that Officer Sizemore should have been called as a witness, that JD was able to ask witnesses leading questions, that a witness on behalf of JD (Officer Scott) was allowed to submit written testimony without cross-examination, and that the panel failed to decide whether nonconsensual sex had occurred.  She also noted the anonymous messages suggested there may have been interference with Officer Sizemore's testimony.

The University responded to Doe's appeal.  Like Doe, it criticized the panel for not determining whether the alleged sexual assault had occurred and for concluding that Doe was not credible based on extrinsic evidence unrelated to the assault.  But the University also took several positions adverse to Doe.  It claimed that several of Doe's arguments were "without merit" and asked the appeals board to reject them.  University Resp. to Appeal, R. 140-39, PageID 2205.  For instance, it disagreed that Officer Sizemore's absence warranted a new hearing.  Deflecting responsibility, the University claimed that it only learned of Officer Sizemore's absence hours before the hearing, and though it could have canceled the hearing the morning of—as it had done for JD in the past—it viewed Officer Sizemore's testimony as "not instrumental" and stated that a continuance would have further traumatized Doe.  University Resp. to Appeal, R. 140-39, PageID 2207–08.  Furthermore, the University told the appeals board that Officer Sizemore was not an "official witness," as she had only served as a witness in one prior hearing (and all three resulted in finding against JD), and, in any event, it entered Officer Sizemore's police report into the record.  *Id.* at PageID 2207.  The University also argued that Doe could have fully participated by objecting to Officer Sizemore's absence and blamed Doe for the "strategic decision" not to.  *Id.* at PageID 2209.  Doe only participated remotely in the hearing for the limited portion of her own testimony, so she was unaware that no University police officer involved in the investigation would be present for the hearing until *after* the panel

issued its decision.  On Officer Scott's report, the University argued that it stipulated to its entry into the record because the testimony was "inconsequential and non-substantive."  *Id.* at PageID 2210.  As for the anonymous messages about Chief Monroe, the University stated that Doe's counsel refused to turn them over to allow an investigation, so the messages did not merit a new hearing.  And it told the appeals board that there was no credible evidence that any University official interfered.

While Doe's appeal was pending before the appeals board, the Title IX Coordinator personally received an anonymous message claiming that Chief Monroe interfered with Officer Sizemore's appearance at the hearing.  The coordinator told other administrators, including the University's general counsel, about the message but made no effort to contact Officer Sizemore for more information.  The University's general counsel only asked Chief Monroe to create a timeline of his version of events.  Nor did the University inform Doe or the appeals board about the message; instead it left unchanged its prior contention to the board—that there was no credible evidence of obstruction.

On April 8, 2017, the appeals board denied Doe's appeal.  According to the appeals board's report, the fourth panel did indeed decide that JD did not rape Doe.  It also found that the hearing officer had reason to allow Doe to be asked questions about her lawsuit.  It concluded that Officer Sizemore's absence, JD's leading questions, and the stipulation to Officer Scott's out-of-hearing testimony comported with due process and would not have changed the result of the panel.  It further found that the panel's decision was not clearly erroneous because the panel was "knowledgeable about sexual misconduct"; reviewed the evidence; and found JD's story to be credible, while Doe was less credible.  Fourth Appeal Report, R. 140-40, PageID 2234. It also emphasized that Doe failed to request a continuance or object at the hearing to Officer Sizemore's absence.  As for the allegations of interference with Officer Sizemore's testimony, it wrote that Doe "refuse[d] to provide evidence" and that it would not overturn the decision based on her "unsubstantiated report of corruption."  *Id*. at PageID 2232.

In November 2017, Doe amended her complaint against the University to add a retaliation claim for complaining of sex discrimination under Title IX.  She asserted, among other things, that the University interfered with the disciplinary process to harm Doe's case,

asked her about her federal lawsuit in the fourth hearing, and found JD not responsible for rape. She then voluntarily dismissed her only other claim, which was for deliberate indifference under Title IX. The University moved for summary judgment on the retaliation claim. The district court granted the motion, concluding that Doe did not make a prima facie showing that the University had retaliated against her under Title IX. Doe timely appealed.

## ANALYSIS

### I. Standard of Review

We review a grant of summary judgment de novo. *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019). Summary judgment is appropriate when there is no genuine dispute of material fact and the movant—here, the University—proves that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If a reasonable jury could find for Doe, a genuine dispute of material fact exists, and summary judgment is not appropriate. *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At this stage, we construe the evidence and draw all reasonable inferences in favor of Doe. *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013) (citing *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008)).

### II. Title IX Retaliation Claim

Before evaluating Doe's retaliation claim, we correct an error in the district court's view of the record that infected its decision. In reviewing the summary judgment record, the district court constrained its analysis to the specific allegations detailed in the operative complaint, rather than to the full scope of record evidence Doe presented in opposition to summary judgment. It critiqued Doe for describing additional examples of the University's retaliatory actions beyond what she included in her complaint. Because it construed these additional examples of the University's retaliation as an improper attempt to "cure the inadequacies" of the complaint, the district court did not consider this evidence and declared that it would narrow its "attention to the facts most pertinent to the claims alleged in the complaint." Op. and Mem., R. 151, PageID 2538. On appeal, Doe argues this was wrong. We agree.

When analyzing a motion for summary judgment, the district court should not limit itself to the allegations contained in a plaintiff's complaint. *Phillips v. Cohen*, 3 F. App'x 212, 220 (6th Cir. 2001). Summary judgment motions follow discovery, and our standard "expressly contemplates" that the non-moving party "may put forward evidence not contained in the pleadings in order to rebut a summary judgment motion." *Id.* (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989)). The plain text of Federal Rule of Civil Procedure 56(c) itself mandates that a court should consider the plethora of material available in the record to determine whether the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). That includes: pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact. *See id.* Certainly, the factual allegations in the complaint must put a defendant on notice of the claims the plaintiff is likely to bring. *See Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). But there is no notice-pleading deficiency here. And Doe could oppose summary judgment by pointing to even more evidence of the University's retaliatory practices that were revealed in discovery than what she alleged in her complaint. The district court's failure to fully consider this evidence was a categorical error, and we now look at all the facts in the record to analyze Doe's retaliation claim.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX also protects individuals who pursue their claims under Title IX from retaliation. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) ("Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment."). We generally evaluate Title IX retaliation claims analogously to Title VII retaliation claims. *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 251 (6th Cir. 2023); *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013), *abrogated on other grounds*, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). So, for Title IX retaliation claims based on circumstantial evidence, we apply the *McDonnell Douglas* burden-shifting framework. *See Fuhr*, 710 F.3d at 674.

Under this framework, Doe must establish a prima facie case of retaliation by showing that (1) she engaged in "protected activity," (2) the University "knew of the protected activity," (3) she suffered an "adverse school-related action," and (4) a "causal connection exists" between the cited protected activity and the alleged adverse action. *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020); *see also Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 320 (6th Cir. 2017). This burden is "easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). If Doe succeeds on the prima facia case, it becomes the University's burden to articulate a "legitimate, nondiscriminatory reason for its action." *Gordon*, 686 F. App'x at 320. If the University is successful, the burden shifts back to Doe to undermine its proffered reason as pretextual. *Id.*

Doe claims that the University intentionally mishandled and unfairly adjudicated her fourth hearing to retaliate against her for bringing her Title IX lawsuit. The University does not contest that Doe's claim meets the first two prongs of the prima facie case. Doe's lawsuit is a protected activity (prong one),[4] and the University was aware of the lawsuit at the time it was filed (prong two). The parties dispute that there's a material question of fact as to whether Doe suffered an adverse school-related action (prong three) and whether a causal connection exists between that action and her lawsuit (prong four). We focus on those disputes.

## A. Adverse School-Related Action

To determine whether a challenged retaliatory action is "adverse" for Title IX purposes, we ask whether the action would dissuade a reasonable person from engaging in the protected activity. *Id.* The Supreme Court articulated this standard for Title VII cases in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 57 (2006), and we have likewise applied it in the Title IX context, with the caveat that the adverse action must be "school-related." *See, e.g.*, *Gordon*, 686 F. App'x at 320. Doe can meet her burden by showing that the University's actions either individually or in combination would dissuade a reasonable person

---

[4]Doe also argues that she engaged in an additional protected action: persevering through the University's lengthy Title IX proceedings. The University does not contest that this conduct constitutes a protected activity. But because Doe's arguments on appeal seem to focus on retaliation following the filing of her federal lawsuit, we also focus our analysis on that alleged protected activity.

from pursuing the discrimination claim. *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569–70 (6th Cir. 2019). Since *Burlington Northern*, our court has recognized that this standard "is not onerous." *Henry v. Abbott Lab'ys*, 651 F. App'x 494, 504 (6th Cir. 2016) (citing cases).

Before it even sifted through the factual record, the district court held that "none of the retaliatory items cited in the Complaint" could be considered "school-related actions" because Doe was no longer a student at the community college (in the dual enrollment program with the University) during the alleged retaliatory actions related to the fourth hearing. Op. and Mem., R. 151, PageID 2540. Reviewing the timeline, the court calculated that the fourth hearing occurred more than two years after Doe had last resided at the University or had "participated in any school-related functions" and concluded "[o]n this basis alone, Doe's claim fails." *Id.* On appeal, the University reiterates this reasoning and further contends that regardless of Doe's enrollment status, the student conduct hearings she participated in are not educational programs or activities. Both the district court's holding and the University's arguments are wrong as a matter of law.[5]

Consider first the district court's conclusion that Doe had to be a "student" at the University at the time of the retaliation. That conclusion defies the statute's text. Title IX protects any "person" from being excluded from or denied the benefits of an educational program because of sex. 20 U.S.C. § 1681. The statute says "person"—not student. And, as the Supreme Court explained, "Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had wished to restrict the scope of [Title IX]." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982). Instead, Congress extended Title IX protections to students and "non-student[s]" alike. *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 708 (6th Cir. 2022). Nor would the University's rule make sense. A sexual assault victim who drops out of school given the trauma, or one who graduates before filing suit, would have no recourse. *See* Br. of C.L. and

---

[5]We previously reversed the district court's ruling that Doe could not pursue a Title IX deliberate indifference claim because she was not "technically" a student at the University of Kentucky, but a student at Bluegrass Community and Technical College, which is affiliated with the University. *Doe v. Univ. of Ky.*, 971 F.3d 553, 558–59 (6th Cir. 2020). Because Doe participated in programs and activities furnished by the University—including living in a University residence hall—we held that she had standing to pursue her deliberate indifference claim under Title IX. *Id.*

Survivor Advoc. Orgs. at 17–18. Accordingly, Doe can suffer an "adverse school-related action" even if she is not a student.

The University's contention that school disciplinary proceedings are not an "educational activity or program" covered by Title IX likewise runs afoul of the statute's text and Supreme Court precedent. Appellee's Br. at 49. Title IX defines the word "program" broadly. *Snyder-Hill*, 48 F.4th at 708. It includes "all of the operations" of a university that receives federal funds. 20 U.S.C. § 1687(2)(A). We recently held that an "'education program or activity' . . . extends to situations in which individuals are, for example, accessing University libraries . . . [or even] attending campus tours, sporting events, or other activities." *Snyder-Hill*, 48 F.4th at 708. The Supreme Court has explained, albeit not in the Title IX context, that school discipline is "essential if the educational function is to be performed." *Goss v. Lopez*, 419 U.S. 565, 580 (1975). Thus, school disciplinary proceedings—like the four in this case—are plainly "education-related" for Title IX purposes.

The upshot: Doe may bring an action under Title IX based on the retaliatory circumstances surrounding the fourth disciplinary proceeding. Student or not, Doe availed herself of the University's disciplinary process and participated in the hearings, making the University's adverse actions regarding those hearings actionable. What Doe must show under this prong is that the University's actions, either individually or in combination, were adverse enough to dissuade a reasonable person from pursuing a Title IX claim. *See Hubbell*, 933 F.3d at 570.

Doe identifies roughly four different categories of university actions that, in her view, satisfy this standard. She points to: (1) the University's delay of the fourth hearing and failure to hold a pre-hearing meeting; (2) the University's failure to adequately prosecute the case before the hearing panel, and then its adversarial positions before the appeals board; (3) the hearing panel and appeals board's procedural and substantive decisions; and (4) the police chief's purposeful obstruction of Officer Sizemore's testimony. We examine each theory in turn, mindful that we ask whether these claims individually or in combination constitute an "adverse school-related action."

*Delay in Scheduling Fourth Hearing.* Construing the facts in the light most favorable to Doe, as we must, the University delayed the fourth proceeding for over a year, canceled the hearing the morning it was supposed to occur on the alleged assailant's request, did not reschedule it until several months later, and then failed to schedule a pre-hearing meeting (in violation of its own policy). That's enough to dissuade a reasonable person from making or supporting a charge of discrimination.

Pointing fingers, the University argues that while Doe and her attorney responded to emails, they did not provide the University with Doe's availability for the hearing.[6] But that hardly explains the extensive delay. The University admits that it did not push forward with the fourth hearing because of Doe's Title IX lawsuit and did not hold the hearing until the lower court admonished it for not doing so in an order denying the University's motion to dismiss. Indeed, it even canceled the fourth hearing on the morning it was supposed to take place in October 2016 because holding the hearing as scheduled "would once again open the door to a post-hearing challenge in federal court." Lawson Letter, R. 140-17, PageID 2096. This cancelation resulted in a delay of another three months.

The University's delay satisfies our adverse-action requirement. We concluded that it was a "materially adverse action" for a school to hold its employee grievance proceedings in abeyance because the employee filed a charge with the Equal Employment Opportunity Commission. *Watford v. Jefferson Cnty. Pub. Schs.*, 870 F.3d 448, 453–54 (6th Cir. 2017). By delaying the grievance process, the school forced the employee to choose between a speedy extrajudicial resolution and an EEOC charge. *Id.* at 454–55. Faced with this decision, we held that many employees may reasonably choose to forgo the EEOC process entirely. *Id.* at 454. The same is true in Doe's case. Two separate, lengthy delays and an abrupt, last-minute cancelation may dissuade a reasonable person from pursuing a Title IX claim in federal court.

---

[6]The University attempts to justify the delay for another reason. It claims—for the first time—that in late 2015, it was facing "two seemingly contradictory Title IX lawsuits": this one filed by Doe, and another filed by the accused (not JD) in a different Title IX proceeding, who argued that the University's Title IX procedures were unconstitutional. Appellee's Br. at 8–10, 45–46. But the University has forfeited this argument, so we decline to consider it. *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 781 (6th Cir. 2015).

*Failure to Adequately Prosecute JD.* Next, Doe points to a host of the University's missteps in prosecuting the case against JD and to its active undermining of multiple aspects of her appeal. Combined, a reasonable juror could find that these repeated failures, too, count as an "adverse action."

Doe asks us to first look at the University's prosecution of JD before the hearing panel, which she deems lackluster and riddled with blunders. The University, for example, allowed Doe to be impeached with testimony from the first hearing, which was previously thrown out as "not admissible in any later proceeding." In re JD Letter, R. 140-30, PageID 2161. It also allowed JD to attack Doe's motive in pursuing disciplinary proceedings against JD, suggesting that she was incentivized by her lawsuit and potential for financial gains. The University's representative did not even object to the line of questioning. Indeed, it did not object to anything at all. Nor did it take steps to present the best case against JD. It failed to secure Officer Sizemore's testimony—it did not even notify the police department that it requested her participation until one business day before the hearing, nor did it reschedule the hearing when she did not appear, even though it had last-minute canceled the fourth hearing previously for JD's concerns. It also stipulated to Officer Scott's testimony because it viewed this testimony as inconsequential. But Officer Scott's testimony bolstered JD's credibility, which was a central issue in adjudicating the rape allegations against him. Indeed, the hearing panel relied on JD's credibility in rejecting Doe's allegations, so Officer Scott's testimony on that topic wasn't a nullity.

Then on appeal, the University actively undermined Doe's arguments to the board and even went as far as calling them "without merit." University Resp. to Appeal, R. 140-39, PageID 2205. It argued, identical to the claims it has made in federal court, that Officer Sizemore's testimony did not have evidentiary value and thus was not necessary in the hearing. In doing so, the University directly contradicted Doe's arguments that Officer Sizemore's testimony was important to Doe's credibility and to the merits of her allegations against JD. It also concluded that the anonymous messages and information contained in them should not be taken seriously and that Officer Sizemore was providing childcare at the time of the hearing. Insofar as Doe argued that the decision should be reversed on those bases, it urged the board to

reject these arguments.  It also blamed the panel's decision, in part, on Doe's decision to testify remotely, calling it "strategic," rather than acknowledging her trauma.  *Id.* at PageID 2209.  The University may proffer justifications for its actions during the hearing and appeal, which are relevant to subsequent steps of the *McDonnell Douglas* inquiry.  But because these actions, if believed by a jury, would deter other victims from asserting their rights under Title IX, they satisfy the "adverse action" requirement at the prima facie stage.

*Hearing Panel and Appeals Board Decisions*. Doe further argues that the fourth hearing panel's procedural and substantive decisions and the subsequent appeals board's approval of those decisions clear the adverse-action threshold. We agree. That's not to say that every time the University resolves a student conduct hearing in favor of the accused it has committed an adverse action. Here, Doe points to some very specific aspects of the hearing panel and appeals board's actions that would meet that standard.

Before reaching a decision, the fourth hearing panel made several procedural decisions that Doe raises as evidence of retaliation.  As mentioned, the hearing panel allowed Doe's prior testimony from the first hearing to attack her credibility, even though the appeals board had previously concluded (in response to JD's appeal when he was found responsible) that the exact same testimony would be inadmissible in all subsequent proceedings.  It also allowed questioning—over her attorney's objection—about Doe's monetary incentives in filing her lawsuit and participating in the student conduct hearings, even though she had participated in three prior hearings before filing this lawsuit.  Additionally, many of the substantive reasons the hearing panel gave for finding Doe not credible—despite finding her credible three times before—are specious and represent a hostility toward her that did not exist before she filed suit.

To conclude that JD raped Doe, the panel needed to find that they had sex without Doe's consent.  Under University policy, "[c]onsent is defined as 'a voluntary expression of willingness, permission, or agreement to engage in specific sexual activity throughout a sexual encounter.'"  Fourth Appeal Report, R. 140-40, PageID 2215.  Furthermore, "[i]t is the responsibility of each person involved in the sexual activity to ensure that he or she has the *affirmative consent* of the other to engage in the sexual activity." *Id.* (emphasis added).

Doe paints the hearing panel's decision as resting on such thin inconsistencies and innocuous details that it deprived her of a fair adjudication. For instance, it noted that while Doe says she let JD into the building from the lobby, a video showed she actually retrieved him from outside the building's entrance. But the distinction between the lobby and the entrance is so trivial, questions arise as to why the panel would hang Doe's credibility on the difference. Second, it pointed to the size of Doe's dorm room to cast doubt on her testimony that JD took off his clothes without her noticing. It ignored Doe's explanation that JD did this while she was on her computer finishing an assignment. Third, the panel explained that the video showed that Doe was wearing a different shirt after the alleged rape, and Doe's testimony only included mention that JD removed her pants. The panel insisted that it was unlikely Doe would have changed her shirt in front of someone who had just raped her. But here, the panel drew inferences from facts not in evidence simply because Doe had not mentioned anything about her shirt in recounting the alleged assault. Fourth, it found it strange that Doe talked to JD after escorting him out of the building and then later sent a text message that said, "I wish you the best." Fourth Panel Report, R. 140-34, PageID 2182. Even though the message was not actually inconsistent with her story, the panel intimated that if Doe was telling the truth, she would never have sent that message. It also ignored other texts in the conversation that arguably bolstered Doe's version of events. Finally, it noted that Doe stated that she did not know that JD had a girlfriend, which was contrary to her testimony from the first hearing where she stated that she did not want to be a "second girlfriend." *Id.* But again, the panel homed in on another slight inconsistency wholly peripheral to her claim and used it to render her entire testimony untruthful. The panel's only reference to direct evidence came at the end. It concluded that the photos taken at the hospital did not evince clear evidence of "biting, restraining, or alleged force." *Id.* Despite these procedural and substantive concerns, the appeals board affirmed the hearing panel in full and dismissed Doe's concerns that the University had not presented the best case against JD.

Viewed together, Doe has created a material question of fact as to whether the University reversed course on dubious grounds as a front for retaliation. The hearing panel considered testimony that it had previously found inadmissible. It allowed Doe's lawsuit against the University to influence its assessment of her complaint against JD. And it proceeded without Officer Sizemore's live testimony from the fourth hearing, even though she had a critical role in

the rape investigation and could have placed Doe's credibility in a more favorable light. Then the appeals board dismissed these and other concerns. Taking these actions together, Doe has met her burden in showing an adverse action.

*Chief Monroe's Interference*. Doe further argues she suffered an adverse action when Chief Monroe interfered with Officer Sizemore testifying in Doe's favor at the fourth hearing and secured Officer Scott's testimony for JD instead. Her argument is that the University is both vicariously liable for Chief Monroe's action and that, once it learned of Chief Monroe's interference, it failed to take adequate steps to protect her from such retaliatory interference.

To the extent that Doe's argument rests on a theory of respondeat superior, it fails. As the district court correctly explained, "any conduct from Chief Monroe is *not* the University's conduct," Op. and Mem., R. 151, PageID 2544, and we have declined to impute a subordinate's unlawful conduct to the educational institution for Title IX retaliation claims unless there is evidence that the actions were taken at the behest of the institution. *See Bose*, 947 F.3d at 988. (rejecting a claim that University could be liable for professor's retaliatory actions after student refused unwanted sexual advances). Of course, all of Doe's evidence of retaliatory behavior stems from employee actions—an institution must act through its people. But the other theories involve actions taken by employees acting on behalf of the University in its institutional capacity (after all, the University admittedly conducts these hearings and serves as judge, jury, and prosecutor, and individuals serving in those capacities are doing so in the University's stead). Regarding Chief Monroe, Doe does not claim he conspired with the Title IX coordinator or any other University administrator to interfere with Officer Sizemore's testimony or that he was otherwise acting at the University's behest. Nor does she create a material question that he had decision-making authority over the hearing; he was only charged with sending the requested officers to testify. Instead, she relies on evidence that Chief Monroe, as a rogue actor, interfered with Officer Sizemore's testimony and asks us to impute his discriminatory conduct to the University. But our precedent forecloses us from doing so.

That isn't the end to Doe's argument regarding Chief Monroe, however, as she also asserts that the University retaliated against her by not adequately responding when it learned about Chief Monroe's actions. That theory rests on the University's own choices in how it

responded to the anonymous messages and other evidence that Chief Monroe interfered with Officer Sizemore's testimony—not just Chief Monroe's actions standing alone. The University can face liability under this theory.

We have never directly addressed whether deliberate indifference to retaliation is a cognizable claim under Title IX. But it is well-established that "retaliation is discrimination 'on the basis of sex.'" *Jackson*, 544 U.S. at 174. And covered institutions have long known that they may face liability when they respond with indifference to known acts of discrimination— retaliation being one such discriminatory action. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). So when a university does not respond to a known retaliatory action because a person has previously complained of sex discrimination, such inaction amounts to the institution's own intentional violation of Title IX. *See id.* at 645; *see also Feminist Majority Found. v. Hurley*, 911 F.3d 674, 695 (4th Cir. 2018) (holding that "an educational institution can be liable for acting with deliberate indifference toward known instances of student-on-student retaliatory harassment"). Quite simply, a university cannot stand idly by when it knows about an act of Title IX retaliation.

The question, then, is whether Doe has created a material question as to whether the University was deliberately indifferent to retaliation by Chief Monroe. Based on the record evidence, she has. Doe points to evidence that the University failed to adequately investigate the allegations brought to its attention. Doe also points to testimony from Officer Sizemore, the person at the heart of the issue, that she believed she was kept from the hearing. Officer Sizemore testified that the University never notified her of either the date of the hearing or the allegations in the anonymous messages, suggesting that she was misled so that she could not present her testimony at the hearing. And the Title IX coordinator's testimony and notes don't show otherwise. Officer Sizemore testified that the coordinator had asked her the narrow question of whether she was told not to go, to which she responded that she was not. And confronted with the fact that Officer Sizemore was, as the coordinator thought, on FMLA leave, the coordinator declined to inform Officer Sizemore of the precise allegations regarding her absence from the hearing. Together, the evidence creates a question as to the adequacy of the University's investigation. And even if these circumstances were not enough to create a material

question of deliberate indifference, there's more. The University defends its decision not to thoroughly investigate because Doe's attorney did not turn over the messages. But the University received a similar message directly alleging that Chief Monroe had interfered. Upon receipt of this information, the University declined to further investigate or even inform either Doe or the appeals board of the additional anonymous message. A reasonable jury crediting Doe's account could conclude that the University was deliberately indifferent to Chief Monroe's obstruction of the key witness at the hearing.

### B.  Causation

Given that Doe has adduced sufficient evidence of multiple adverse school-related actions, we next ask whether a causal connection exists between those actions and her protected activity of filing a Title IX suit. For that inquiry, we evaluate whether Doe has presented "evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Fuhr*, 710 F.3d at 675.[7] This "burden is minimal." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). Doe need only "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *Id.* She has.

Doe's argument regarding causation relies on a classic "before-and-after" comparison. The first three times the hearing panel considered this student conduct matter, it concluded that Doe was credible, and JD was culpable. Then she filed this Title IX lawsuit. Afterward, the hearing panel considered the same student conduct matter again and came to the opposite conclusion. What changed? Doe would say it was the lawsuit. And Doe emphasizes not only the outcome of the initial three versus fourth hearings, but also the University's conduct and decisions both before and after she filed her lawsuit.

---

[7]In *Nassar*, the Supreme Court held that plaintiffs needed to show that the protected activity was the "but-for" cause of the suffered adverse action to establish a prima facie case of retaliation under Title VII. 570 U.S. at 352. While some of our sister circuits have queried whether *Nassar* applies to Title IX retaliation claims, *Hurley*, 911 F.3d at 696 n.10, we have continued to apply the pre-*Nassar* standard for Title IX claims. *Fuhr*, 710 F.3d at 675; *Gordon*, 686 F. App'x at 320; *Bose*, 947 F.3d at 988; *see also Nassar*, 570 U.S. at 355–56 (distinguishing Title VII's text from Title IX's "broad and general terms" that contemplate a broader swath of retaliatory conduct). Therefore, we do so here.

Consider the University's conduct before and after the lawsuit with respect to the various alleged adverse actions we just considered.  For the first three hearings, the University scheduled them promptly.  Then, before the fourth hearing, there was an extensive delay.  The University admits that Doe's lawsuit was the reason it delayed scheduling her fourth hearing.  For the first three hearings, the University held pre-hearing meetings, but not for the fourth.  For the first three hearings, it was sympathetic to the fact that Doe might not want to attend in person given her trauma and hospitalizations, but for the fourth, it faulted her "strategic" choice not to be present.  University Resp. to Appeal, R. 140-40, PageID 2231.  For the first three hearings, it backed Doe's arguments on appeal, but on the fourth appeal, it undermined and argued against many of them.  For the first three hearings, the minor discrepancy between Doe's testimony that she met JD in the lobby of her building when the video showed her meeting him directly outside her building did not defeat her testimony; on the fourth, the University used that trivial discrepancy to conclude she was not credible.  The same is true for Doe's change of shirt; for the first three hearings, the fact that she changed her shirt after the alleged rape was inconsequential, but not during the fourth.  For the first three hearings, the University concluded—based on largely the same evidence—that Doe was credible, yet for the fourth, it did not even object when JD impugned her credibility by pointing to her federal lawsuit and the potential for a financial award.  Nor did it inform her or conduct a thorough investigation when it received evidence of Chief Monroe's interference.

The University responds with various nondiscriminatory explanations for each of these actions.  The delay, it says, was to accommodate Doe's needs; the changes in procedure were to protect JD's due process rights; the decision not to reschedule the hearing for Officer Sizemore was because Doe had prevailed without her in the past; the investigation of Chief Monroe was not cursory because Doe would not turn over the messages; the panel concluded Doe was not credible due to inconsistencies in her testimony, and so on.  We do not dismiss the University's explanations, but they are more properly presented to a factfinder than to us.  The juxtaposition of the University's conduct during the first three hearings (before her lawsuit) compared to the fourth (after her lawsuit) leads to a reasonable inference that the University engaged in these adverse actions because of Doe's lawsuit and casts doubt as to whether the University's explanations were the actual reason for its conduct.  *See George v. Youngstown State Univ.*,

966 F.3d 446, 459–61 (6th Cir. 2020).  That's sufficient for Doe to meet her "minimal" burden in establishing her prima facie case and to progress to the next stages of the *McDonnell Douglas* test.  The district court did not consider steps two and three of *McDonnell Douglas*, so we return the case to the district court to do so consistent with our analysis of the prima facie case.  *E.g.*, *Avery Dennison Corp.*, 104 F.3d at 863.

## III.  Purported Additional Bases for Affirmance

The University contends that, irrespective of whether Doe has established a prima facie case of Title IX retaliation, we still must affirm the district court's order on three alternative bases.  It claims that Doe cannot recover for an emotional injury, there is no private right of action for retaliation under Title IX, and the University is entitled to sovereign immunity from this suit.  We address these arguments in turn and reject them all.

### A.  Emotional Distress

The University contends that Doe's Title IX retaliation claim must fail because she alleges only emotional injuries, and the Supreme Court has foreclosed emotional distress damages under Title IX.  *See Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 230 (2022).  But it mischaracterizes Doe's injury. Doe alleges she was deprived "of equal access to the educational benefits and opportunities provided by the University."  Third Am. Compl., R. 57, PageID 376.  Discrimination is itself a harm. *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 980 (2024) (Kavanaugh, J., concurring).

As discussed above, the student conduct proceedings the University has made available to Doe and other alleged victims is an "education-related" program established to protect against sex-based discrimination.  By retaliating against her for filing this lawsuit, Doe claims that the University has punished her for seeking to vindicate her rights under Title IX.  Doe's harm, then, is discrimination on the basis of sex, which is an injury recognized by Title IX.  *See* 20 U.S.C. § 1681(a).  So the University's argument is without merit.

**B.  Private Right of Action**

The University next argues that Title IX does not support an implied private right of action against retaliation.  As it must, the University recognizes that its argument is foreclosed by the Supreme Court's decision in *Jackson v. Birmingham Board of Education*, which recognized such a cause of action.  544 U.S. at 171.  And while the University argues that *Jackson*'s underpinnings have been eroded by subsequent Supreme Court cases, it also acknowledges, rightly, that *Jackson* remains binding until overruled by the Supreme Court.  Therefore, the University has preserved the argument "for possible Supreme Court review," but we reject it based on *Jackson*.  Appellee's Br. at 31.

**C.  Sovereign Immunity**

Lastly, the University argues that it is entitled to sovereign immunity.  In doing so, it concedes that in *Franks v. Kentucky School for the Deaf*, we held that "Congress made its intention to abrogate the states' Title IX immunity unmistakably clear."  142 F.3d 360, 363 (6th Cir. 1998).  But the University argues that we should distinguish Title IX retaliation claims from other Title IX claims for sovereign immunity purposes.  That argument falters because Title IX retaliation claims are not based in a different part of Title IX than the claim we analyzed in *Franks*, and the University was on notice that it was subject to these claims when it accepted federal funding.  *See id.*  *Franks* plainly applies, and we decline to limit its scope to exclude retaliation claims.

CONCLUSION

We reverse the district court's order granting summary judgment in favor of the University and remand for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

ALICE M. BATCHELDER, Circuit Judge, dissenting.  Once more, we enter the judicially created mire of Title IX jurisprudence.  And, unfortunately, this majority opinion does not provide clarity.  Perhaps this is due to either the messy facts of this case or the messy law (or both).  On the facts, the majority decides for itself that JD sexually assaulted Jane Doe, and it proceeds from that premise at every turn: in presenting its version of the facts, in criticizing UK's conduct of the Title IX hearings and appeals, in finding adverse education-related action, and in its incredulity that the fourth hearing (after three appellate reversals) reversed course and found no sexual assault.  I do not know whether this is cause or effect of the "messy facts," but either way, after a thorough review of this record, I cannot subscribe to the majority's version of facts.  As for the "messy law," I am reminded of Justice Thomas's lamentation in *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 195 (2005) (Thomas, J., dissenting), that "the majority returns this Court to the days in which it created remedies out of whole cloth to effectuate its vision of congressional purpose."  I respectfully dissent.

I.

"Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  *Theidon v. Harvard Univ.*, 948 F.3d 477, 496 (1st Cir. 2020) (cleaned up); *accord Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."); *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (explaining that circumstantial evidence of retaliation amounting to no "more than bare allegations" will not be enough to defeat a motion for summary judgment).  Here, with conclusory allegations, improbable inferences, and unsupported speculation Doe has crafted an

overarching conspiracy theory[1] that UK has retaliated against her from the time that she filed this action in 2015 through every action that UK has taken since that filing.

Of course, we review summary judgment rulings de novo, construing the facts in the light most favorable to the nonmovant, *see Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020), but we must look to the *entirety* of the record in this review. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[2] And Doe must do more than cast "metaphysical doubt" over the material facts regarding whether a reasonable juror would believe that she established a prima facie case of Title IX retaliation. *Id.* at 586; *see also Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). To draw inferences in favor of the nonmovant does *not* mean that we blindly accept the nonmovant's assertions at face value. Instead, we construe favorably the nonmovant's statements of fact that are supported by the record.

Moreover, although we review the district court's summary judgment ruling de novo, we do not scrutinize school disciplinary proceedings—such as the one at issue here—with the same scrutinous review. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648–49 (1999); *New Jersey v. T.L.O.*, 469 U.S. 325, 342–43 n.9 (1985); *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 507 (1969). School disciplinary proceedings are *not* criminal trials that require the formalities of a courtroom. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 (6th Cir. 2005); *see also Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 88 (1978) ("A school is an academic institution, not a courtroom or administrative hearing room."). So, some deference is due to the school in the way it conducts its disciplinary proceedings, particularly when the record does *not* show that the proceeding at issue was constitutionally deficient. *Davis*, 526 U.S. at 648–49; *New Jersey*, 469 U.S. at 342–43 n.9. We do not substitute our view of school policies or impose what we think would have been the best practice when the hearing was

---

[1]In her appellate brief, Doe alleges that almost every party involved in UK's Title IX process acted with retaliatory intent against her. These include, to name a few, the Dean of Students, the Title IX Hearing Officer, the then-Deputy Title IX Coordinator, the hearing panel, the UK appeals review board, UK's general counsel, and the UK Chief of Police. According to Doe, the only nonretaliatory party whom UK employed was Officer Sizemore. To reverse course after denying JD due process, and provide both parties with constitutionally sufficient due process, is not evidence of a vast conspiracy to retaliate against Doe.

[2]And in this de novo review of summary judgment we can affirm on any basis supported by the record. *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield*, 722 F.3d 861, 865 (6th Cir. 2013).

constitutionally sufficient, that is, both parties to the proceeding were afforded due process. *Goss v. Lopez*, 419 U.S. 565, 580 (1975); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017); *see also Mathews v. Elridge*, 424 U.S. 319, 334–35 (1976).

In sum, we should not craft judicial remedies "out of whole cloth" or ignore parts of the record while highlighting others so that a claim survives a motion for summary judgment.

## II.

While at UK, Jane Doe accused her ex-boyfriend ("JD") of sexual assault. Surveillance footage twice showed Doe and JD together on October 2, 2014. First, Doe exited her residence hall, met JD, and escorted him to her dorm. Doc. 140-34, PageID#2182. Later, Doe and JD were seen on video for a second time as they exited Doe's dorm. *Id.* This time Doe wore an entirely different outfit. *Id.* As Doe signed JD out of the dormitory, they were talking with one another. *Id.* Doe alleges that between these two appearances on surveillance video, JD raped her while they both were in her dorm room.

After talking with her roommate and calling her mother, Doe called the UK police department to report a rape. Around this time, a series of text messages were exchanged between Doe and JD.[3] Responding to Doe's call, Officer Laura Sizemore took Doe to the hospital to be examined for sexual assault.[4]

UK immediately—meaning the next day, October 3—issued a no-contact order and suspended JD. As the majority recounts in some detail, the first disciplinary hearing was on October 8, from which the hearing panel found JD guilty and permanently expelled him. JD appealed to the University Appeals Board (UAB), which reversed because the hearing had been

---

[3]*See infra* Section II, pg. 34.

[4]The medical report from that hospital visit shows that Doe claimed that JD ejaculated on her clothes or her bedding. Doc. 131-1, PageID#1575. The examiner did not find evidence of vaginal injury. *Id.* at 1576. The majority states that Doe sustained lacerations to her shoulder and back, but the medical examiner noted that Doe had "thin" "scratches" on the "back of [her] neck and shoulder." *Id.* at 1575, 1577. The examiner categorized Doe's injuries as "AB," "TE," and "AB/TE," meaning abrasion, tenderness, and abrasion/tenderness, respectively. *Id.* at 1577.

held without JD.**5**  The second hearing was held on December 18, 2014; the panel again found JD guilty, and the UAB reversed again—this time because the hearing panel heard recorded testimony from Doe from the first hearing, and JD did not have an opportunity to cross-examine Doe or her witness.**6**  The UAB explained that Doe's recorded testimony from the first hearing "was not admissible in any later proceeding against [JD]."  Doc. 140-30, PageID#2161.  The third hearing was on March 26, 2015, and the panel again found JD guilty.  But on June 9 the UAB reversed once more because Officer Sizemore and Detective Brannock testified in each other's presence in blatant violation of the procedures set out in the student code of conduct.  It bears mention that this third hearing was the only hearing that Officer Sizemore attended and that by the date of the third reversal, UK was in summer session.

On July 29, then-Director of the Office of Student Conduct, Dr. Denise Simpson, emailed Doe about scheduling yet another hearing with the "goal . . . to schedule this hearing as soon as we can."  Doc. 140-2, PageID#1995.  Because JD was no longer enrolled at UK, Doe responded to the email that she "would like to request [that] the process be suspended unless/until [JD] attempts to return to UK."  *Id.* at 1996.  In subsequent emails, Doe asked whether the hearing could occur in August.  Dr. Simpson then sent Doe a confidential, online poll regarding Doe's August-availability.  However, on July 30, Doe stated that she had retained new counsel and would need to check on her attorney's availability before proceeding with scheduling the fourth hearing.

In August, Doe withdrew from BCTC.  At that time, Doe's new attorney, Elizabeth Howell, sent UK a Cease Direct Contact letter, stating that "we certainly object to the fourth hearing" but will participate to the extent necessary to find JD responsible.  Doc. 140-3, PageID#2001.  On October 1, 2015, Doe initiated this action in federal court.  Her sole claim was for Title IX deliberate indifference to harassment, and she requested as injunctive relief that UK comply with Title IX law "to be determined at trial."  Doc. 1, PageID#11.  The nature of the injunctive relief was unspecified.  Around that time, UK faced a competing lawsuit featuring an

---

**5**JD had requested a continuance, but his request was denied, Doc. 12, PageID#149–50, and following the first hearing, JD withdrew from classes and UK housing.

**6**Around this time, Doe had re-enrolled in classes at BCTC.

inverse claim—one filed by a student accused of sexual assault (not JD), complaining that UK did not afford accuseds adequate due process.  Doc. 8-1, PageID#116; *see also* Doc. 8, PageID#114–15 (Motion to Consolidate).

UK moved to dismiss Doe's lawsuit on January 6, 2016, claiming that Doe's injunctive relief was not specific and that it did not specify "what Ms. Doe wants the [c]ourt to compel [UK] to do through injunctive relief."  Doc. 5, PageID#18.  Doe filed a response to that motion on January 27, 2016, stating that she did not seek "to enjoin the on-campus proceeding against JD."  Doc. 9-1, PageID#136.  The very next day, UK emailed Doe's attorney, stating that "given [Doe]'s explicit representation to the federal court that she will not seek to enjoin any future student disciplinary proceedings, [UK] wishes to schedule the fourth hearing as soon as possible."  Doc. 140-37, PageID#2035.  Doe's attorney responded that she was coordinating with Doe and Doe's mental health provider and that she would "have a firm answer to you regarding her participation as soon as possible."  Doc. 140-8, PageID#2037.  Doe's attorney requested to be updated if JD's counsel provided UK with potential dates.  The record reflects that neither party followed up from this email exchange.

The district court denied UK's motion to dismiss and admonished UK for delaying the fourth proceeding.  The district court explained that "[e]ven if [UK] viewed this lawsuit as a bar to scheduling the fourth disciplinary hearing, that does not explain the four months between the third UAB decision and the filing of the Complaint in this case."  Doc. 12, PageID#156.  It is noteworthy that UK had delayed the fourth hearing *before* Doe filed this lawsuit, meaning that the delay up to that point could not have been in response to Doe's filing this lawsuit.  The court also took the time to admonish UK about its constitutionally insufficient Title IX hearings that consistently deprived *accuseds* of due process.  *Id.* at 154–55; *see also id.* at 154 n.2.  In so doing, the court dismissed Doe's claim that UK was deliberately indifferent to her rights throughout the Title IX process.  The district court said, "Although it was a protracted process due to the errors in the hearings, the facts pled show the University took significant action and did not act with deliberate indifference regarding [Doe]'s sexual assault allegations during the three hearings and appeals."  *Id.* at 155.  In sum, the district court explained that the Title IX

process at UK was constitutionally sufficient for accusers while it was insufficient towards those accused of sexual assault.

A day later, on September 1, 2016, UK—through counsel—attempted to schedule a fourth hearing between September 15 and October 15, 2016. Based upon both Doe's and JD's counsel's schedules, the fourth hearing was set for October 19, 2016. Doc. 131-12, PageID1669–72; *see also* Doc. 131-13, PageID1673.[7] The Hearing Officer for the fourth hearing, Professor Robert G. Lawson[8] granted a continuance on the day of the hearing, stating that there were due process concerns that he needed to remedy before proceeding. Namely, Doe had requested that her testimony for the fourth hearing "be presented in the form of a record of her testimony from the prior hearing." Doc. 131-13, PageID#1674. Professor Lawson granted that request.[9]

After he granted Doe's request to use her prior testimony in lieu of testifying at the fourth hearing, Professor Lawson turned Doe's recorded testimony over to JD's counsel for review. JD's counsel raised "a number of questions concerning" due process *because* of the recorded testimony and what impact the testimony would have on "the objectivity of the hearing panel." Doc. 131-13, PageID#1674. So, attempting to prevent yet another appeal and reversal on due process grounds, Professor Lawson decided that a continuance was appropriate. The fourth hearing was rescheduled for November 14 and then once more to January 10, 2017.

At this point, a bit of information about UK's Title IX hearing procedure is in order. Prior to any Title IX hearing, UK holds a pre-hearing resolution meeting. However, UK did not hold that pre-hearing meeting before the fourth hearing. A panel of three faculty members

---

[7]JD's counsel's law partner passed away, so JD's counsel requested "another week or so" after October 15, 2016. Doc. 131-12, PageID#1671. Doe's counsel was in court "Monday and Friday" of the week of October 17–21. *Id.* at 1669.

[8]Robert Lawson authored both the Kentucky Penal Code and the Kentucky Rules of Evidence and was twice dean of the University of Kentucky College of Law. John Cheves, *After 50 Years at UK, Professor who Wrote much of Kentucky Law and Investigated UK Athletics is Retiring*, Lexington Herald Leader, https://www.kentucky.com/news/local/education/article44605044.html, (June 15, 2015, 11:50 PM).

[9]The record reflects that Doe was diagnosed with PTSD after the third hearing and was hospitalized. Professor Lawson explained that in granting Doe's request to use her recorded testimony, he "was trying to ease the difficulty of the process for [Doe]." Doc. 131-14, PageID1674.

composes the hearing panel who decides the case.  Per UK policy, both parties to a Title IX hearing "shall submit to the Hearing Officer any information they wish to present at the hearing, the name(s) of support person(s) and whether the support person is an attorney, [a] preliminary list of questions, and a possible list of witnesses six (6) business days prior to the hearing."  Doc. 140-11, PageID#2071.  After that information is submitted to the hearing officer, "[t]he Title IX Coordinator shall arrange the attendance of witnesses who are members of the [UK] community, if reasonably possible."  *Id.*  Hearing officers "rule[] on all questions of law, whether substantive, evidentiary, or procedural."  *Id.* at 2070–71.  The Hearing Officer is responsible for screening the questions and posing them to both parties at the hearing.  Prior to the hearing, all parties have an opportunity to object to questions that they deem irrelevant.

At the fourth hearing, Doe was represented by UK Dean of Students Nick Kerhwald and her own attorney, Elizabeth Howell.  Dean Kerhwald was Doe's university representative, whose role was to prove by a preponderance of the evidence that JD violated the student code of conduct.  But both Kerhwald and Doe's attorney could object at the hearing.  Doc. 140-11, PageID#2071, 2072; Doc. 140-28, PageID#2146; Doc. 140-16, PageID#2091.  Per her attorney's requests, Doe attended the hearing via closed-circuit television connection for cross-examination, and her recorded testimony from the third hearing was used in lieu of her providing direct testimony.  Dean Kerhwald argued the case for Doe, albeit without presenting any objections, and closed argumentation in the fourth hearing by stating Doe's case that JD violated the UK policy on sexual conduct.  Officer Sizemore's police report was read into evidence at the fourth hearing in lieu of live testimony.[10]  Officer Sizemore later stated that her live testimony,

---

[10]Regarding Sizemore's absence, a series of unfortunate events occurred—some of which are immaterial to the resolution of this dispute.  For starters, the record reflects that Sizemore did not attend the fourth hearing because she had childcare issues on that day.  Doc. 140-1, PageID#1986–87; Doc. 131-34, PageID#1905–06.  The record further reflects that Doe's attorney was informally told that Sizemore was on FMLA leave on the day of the hearing.  Doc. 140-38, PageID#2199.  But Sizemore claims that something was awry.  Doc. 140-1, PageID#1988, 1990.

A day before the hearing, Sizemore was called into UK Chief of Police Monroe's office.  Monroe asked Sizemore if she had childcare issues and if she had to be somewhere on January 10, 2017, she could not be for those issues.  *Id.* at 1986–87.  Sizemore responded in the affirmative.  Later, when Sizemore found out that the fourth hearing took place while she had childcare issues, she was "extremely upset."  Doc. 140-27, PageID#2137.  When Sizemore found out that "someone was told [she] was on FMLA and . . . that [she] couldn't attend this hearing and that hearing," Doc. 140-1, PageID#1989, she thought, "that didn't look good."  *Id.*  So, she drafted a memo on January 17, 2017.  Sizemore's memo confirms that Chief Monroe asked her if she had childcare issues.  Doc. 131-34, PageID#1905–06.  After the fact, and reported to nobody with Title IX authority until this litigation, Sizemore

if provided, would not have differed from her police report. Doc. 140-1, PageID#1992; Doc. 131-1, PageID1592 (Beauman Cross-Examination of Sizemore). Sizemore made clear that she could have provided more opinions beyond the scope of her police report but that everything she knew, factually, was contained in her report. Doc. 140-1, PageID#1992.

During cross-examination, Professor Lawson allowed questions that explored Doe's credibility and motivations. Specifically, Doe was impeached with recorded statements from the first hearing in which she stated that she did not want to be JD's "second girlfriend." The UAB had held that this recorded testimony was not to be used in a later proceeding *against JD*. Doc. 140-30, PageID#2161. The UAB had not categorically excluded that testimony from any other use. Professor Lawson also allowed a question about Doe's financial motivations. He asked Doe if she was concerned "that if [JD] is not found responsible in this proceeding . . . could [it] have a negative effect on your lawsuit?" Doc. 140-29, PageID#2151.

In finding that JD was not responsible for the charged violations, the hearing panel concluded that JD was more credible and plausible than Doe. The hearing panel found inconsistencies in Doe's version of events, stating that the evidence showed that Doe "had to go outside to retrieve [JD]," instead of JD's calling Doe from the lobby of the dormitory. Doc. 140-34, PageID#2182. The hearing panel questioned how it was possible, given that Doe and JD were together in Doe's dorm room and the small space of that room, that Doe could not have been aware that JD had disrobed. The hearing panel also explained that Doe could be seen wearing one outfit taking JD to her room but reappearing in an entirely different outfit as she escorted him out of the dormitory. In the panel's formulation, "why would [Doe] remove [her]

questioned the intentions of Chief Monroe, stating that "his intentions . . . were not innocent at the time." Doc. 140-1, PageID#1989.

Backing up further in time, on January 6, 2017, Jeremy Enlow (UK's then-Equal Opportunity Investigator) emailed Captain Bill Webb about having two UK police officers testify at the fourth hearing. The officers requested were Laura Sizemore and Eric Scott, the football liaison. Sizemore was requested by Doe, and Scott was requested by JD. *See* Doc. 140-6, PageID#2033; Doc. 140-21, PageID#2108; Doc. 140-48, PageID#2507. Webb was not in the office that day, so he did not respond until Monday, January 9. Doc. 140-21, PageID#2108. After Enlow told Webb what Title IX matter both Sizemore and Scott were requested for, Webb responded that *both* officers were unable to attend and to contact Chief Monroe with any other questions. *Id.* at 2106. Enlow contacted Monroe, who—at that time—met with Sizemore about her childcare issues and made a police-training accommodation to allow Scott to skip the training and attend the hearing.

Ultimately, *neither officer* attended the hearing. Scott's testimony was stipulated to, and Sizemore's police report was read into the record.

shirt in order to change in front of [her] alleged attacker," when Doe alleged that JD removed her pants, not her top-wear.  *Id.*  The panel found it odd that Doe and JD continued with conversation, after Doe had signed him out of the dormitory as shown on surveillance footage.  And the text messages sent between Doe and JD "did not align correctly with [Doe's] testimony."  *Id.*

Prior to Doe's interactions with her roommate and mother, Doe texted JD.  *See* Doc. 131-1, PageID#1579–84.  After telling JD to delete her number, she texted, "we aint working g shit" because he was "a hoe."  *Id.* at 1579.  She later texted, "Bye i wish you best !"  *Id.* at 1580.  In response to a heart-break emoji sent by JD, Doe replied with two laughing-face emoji's "yeah that me , thanks !  please delete my number  ."  *Id.*  Later, Doe's roommate took her phone and texted JD, "stay your gorrilla looking ass away from [Doe]."  *Id.* at 1581.  The roommate further texted, "i know you raped her" "and if the cops dont get you, then i will be sure of it that youre off the foorball team and out of Uk and [Doe's] life!"  *Id.*  Then, when Doe herself texted JD, she asked "what did earlier mean ?"  *Id.* at 1582.  JD replied, "Why would she play around like that [referring to the roommate] , it's not funny or a joke to play around like that [Doe] . That's can fuck shit up for everything ."  *Id.*  Doe replied, "i did tell you to stop didnt i ?"  *Id.* at 1583.  JD said back "I have sisters dude, I wouldn't do that.  Why you wanna say I did something like that."  *Id.*  Doe did not respond.

The panel also stated that "the photos taken at the hospital of [Doe] were not clear indications of the allegations made of biting, restraining, or alleged force used against [Doe]."  Doc. 140-34, PageID#2182.  Finally, the panel took issue with Doe's assertion that she did not know that JD had a girlfriend at the time of the incident.  The panel members explained that they "listened to a recorded testimony of [Doe] in which she stated not being a second girlfriend, which caused an additional level of concern in regard to the credibility of [Doe]."  *Id.*  Doe appealed to the UAB.

As for UK's appellate process, the record clearly reflects that, *on appeal*, UK does *not* stand in the shoes of the complaining witness as it does during Title IX hearings.  The student code of conduct explains that the "respondent or complaining witness may appeal the decision and/or sanction."  Doc. 140-11, PageID#2073.  Notably absent from who can appeal is the

university.  Instead of representing the complaining witness on appeal, the university may file a separate response to the appeal—not on behalf of either party.  *Id.* at 2074.  And this is exactly what UK did here.[11]

Doe's appeal consisted of seven claims as categorized by the appeals board.  The first was that the hearing panel failed to make a finding on whether the sexual activity between Doe and JD was consensual.  Doc. 140-40, PageID#2216-17.  The UAB concluded that this claim lacked merit.  By finding in favor of JD, the hearing panel concluded that JD did not rape Doe, and the UAB explained that the word "consent" need not appear when it can reasonably be deduced that the hearing panel found the sexual activity to be consensual.

Next, Doe claimed that UK violated her due process rights (1) as a result of a line of questioning regarding her criminal complaint against JD and civil case against UK;[12] (2) because JD submitted testimony about his background while Doe did not; and (3) because Doe's witness (her roommate) was questioned about counseling that she had received.  *Id.* at 2218–2228.  The UAB found that the line of questioning did not violate Doe's due process rights because Professor Lawson reasonably weighed the potential motivation in Doe's testimony versus bias that cross-examination questions might engender.  The UAB also found that Doe was not limited in what information she could have presented.[13]  And the questions as to Doe's witness's counseling "provided context as to [the witness's] whereabouts and emotional state on the day in question."  *Id.* at 2228.

---

[11]In its response, UK summarized Doe's appellate claims in three categories: (1) new information, (2) due process concerns related to Officer Sizemore's absence and her police report, and (3) a concern that the hearing panel did not include a factual finding that sexual activity occurred.  Doc. 140-39, PageID#2205.  In UK's separate role on appeal, it argued that Doe's first two grounds for appeal were without merit while the third ground was meritorious.  The majority takes issue with the fact that UK took some positions that were adverse to Doe on appeal.  But the majority's concern fails to recognize that UK's role on appeal was *not* the same as its role during the fourth hearing.  UK was free to advance arguments that it deemed meritorious while advocating against arguments that lacked merit.

[12]The criminal complaint that Doe filed against JD was dismissed by the time of the fourth hearing and Doe's appeal.  In fact, the grand jury in that case chose not to indict JD.

[13]Baked into this claim was another claim that JD was asked leading questions about the size of the dorm room.  The UAB found that, regardless of testimony about the size of the room, the hearing panel could have found—based solely on pictures of the dorm—that the room was so small that Doe could not have been unaware of JD's disrobing.  Doc. 140-40, PageID#2226.

Doe also claimed that new information had come to light that would have altered the panel's decision, related to Officer Sizemore's absence at the fourth hearing. Implicit in this claim were two accusations: (1) that Officer Sizemore's absence violated Doe's right to due process and (2) that UK Chief of Police, Joseph Monroe, acted to manipulate the outcome of the hearing by preventing Officer Sizemore from testifying. *Id.* at 2230. Regarding Officer Sizemore's absence and potential due process concerns, the UAB reasoned that Doe and her counsel as well as JD could have requested a continuance to reschedule the hearing at a time when Officer Sizemore could attend. In response to this portion of Doe's appeal, UK stated that it investigated the allegations of witness interference and concluded that no further investigation was warranted. Furthermore, UK "contacted Officer Sizemore . . . regarding any pressure to not participate in the [fourth hearing]. Officer Sizemore indicated there was no pressure from any University official for her not to participate in the hearing. Officer Sizemore indicated she was unable to attend because she was unable to secure childcare for her infant child." Doc. 140-39, PageID#2208.

The UAB also stated that Officer Sizemore's report was read at the fourth hearing, and JD had forfeited the right to cross-examine Officer Sizemore as well. The UAB concluded that Officer Sizemore's absence did not have an impact on the hearing.

Regarding the allegation that Chief Monroe attempted to influence the proceeding by preventing Officer Sizemore's testimony, the UAB noted that Doe's attorney received anonymous, encrypted emails nine days after the fourth hearing containing this allegation. When asked to provide the emails, Doe's attorney refused. The UAB stated that "[Doe] cannot raise the spectre of corruption, refuse to provide evidence, and then rely on her allegations to reverse the Panel's decision." Doc. 140-40, PageID#2232. Even after Doe's attorney would not provide the anonymous emails, UK's then-Deputy Title IX Coordinator, Martha Alexander, investigated the allegations of interference. Notably, as Deputy Alexander testified, when investigating an allegation made through anonymous email, there is no complainant with whom to follow-up.

Deputy Alexander called Officer Sizemore to investigate. Doc. 140-1, PageID#1990. Apparently, Alexander believed that Sizemore had not been at work for some time, consistent with the mistaken belief that Sizemore was on FMLA leave, because when Alexander stated that

she was "glad" that Sizemore was "finally back to work" and Sizemore responded that she had already been back for some time, Alexander fell silent. *Id.* Sizemore testified that Alexander "seemed pretty aggravated" after hearing that. *Id.* Then, rather than simply confirming the police department's reason for Sizemore's absence at the fourth hearing (childcare issues), Alexander asked, "Did someone tell you not to go [to the fourth hearing]?" *Id.* Sizemore responded, "[n]o." *Id.* Sizemore interpreted this question as asking if someone had threatened her not to go. She elaborated that "what popped in my head was the conversation with chief [Monroe] from prior," but she did *not* tell Alexander about that and her belief that Monroe was interfering with the hearing. *Id.* When UK eventually received copies of the anonymous email, UK decided that no further investigation was warranted. Later, another anonymous, encrypted email was sent directly to UK that was materially the same as the others, which prompted UK to ask Chief Monroe to account for a timeline of events leading up to the fourth hearing. Doc. 140-36, PageID#2193; Doc. 140-46, PageID#2476; Doc. 140-24, PageID#2128–29 (timeline).

Doe's final claim to the UAB was about the fourth hearing panel's alleged failure to "distinguish the real facts of the case which have remained unchanged over four traumatic hearings, from the irrelevant extrinsic evidence presented" by JD. Doc. 140-40, PageID#2233. The UAB reasoned that the panel heard evidence presented by both parties and a witness. The panel reviewed photographs and videos while also examining Officer Sizemore's police report. The panel found JD to be more credible than Doe. The UAB found that the panel's conclusion was not clearly erroneous.

Now, returning to Doe's lawsuit against UK, after a series of amended complaints, one claim remained before the district court: Title IX retaliation. UK moved for summary judgment, and the district court granted that motion, stating "Because Doe's assertions are too speculative to the survive summary judgment standard, the Court finds that [UK] is entitled to judgment as a matter of law." Doc. 151, PageID#2534. The district court explained that Doe had "not submitted evidence from which a reasonable jury could conclude that she established a prima facie case of retaliation." *Id.* at 2546.[14] While flawed on the education-related nature of these

---

[14]In so doing, however, the district court committed two errors. First, the district court stated that it restricted its view of Doe's Title IX retaliation claims to Doe's operative complaint. It is worth noting that the court

Title IX proceedings, the district court's ultimate holding—that Doe did not suffer an adverse action for purposes of a Title IX retaliation claim—is correct, and, albeit on alternative grounds, I agree.

Doe speculates that at every turn, UK responded with retaliatory animus towards Doe. However, it is clear that when considered in its totality, the record contains no genuine issues of material fact. Even construing all facts and inferences in a light most favorable to Doe, this case should not go beyond summary judgment, and we should be hesitant to expand our judicially created Title IX law on this record.

### III.

In 2005, the Supreme Court created an implied private right of action for Title IX retaliation claims. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005); *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 703 (1979) (creating an implied private right of action to enforce Title IX). The Court coupled retaliation with gender-based discrimination to create this right of action, explaining that the retaliation must be motivated by gender-based

---

still considered facts and details beyond those to which it was supposedly restricting itself. UK had argued that Doe asserted more retaliatory actions in response to UK's motion to dismiss the third complaint. While Doe clarified what retaliatory actions she was pleading in her response, that clarification did not actually contain new allegations. *Compare* Doc. 57 *with* Doc. 106. So, UK's characterization of the operative complaint and the subsequent pleadings was incorrect. Moreover, on summary judgment, we look to the record "taken as a whole." *Matsushita Elec.*, 475 U.S. at 587. The district court's supposed restriction was error. Here, I agree with the majority.

Second, the district court stated that the passage of time destroyed the educational nature of the fourth hearing. This was also error. We addressed this issue in a prior appeal, in which we established that Doe has standing to pursue her Title IX retaliation claim. *See Doe v. Univ. of Ky.*, 971 F.3d 553, 558-59 (6th Cir. 2020); *see also id.* at 558, 559 n.4; *Goss*, 419 U.S. at 580 (explaining that school disciplinary proceedings are "essential if the educational function is to be performed"); *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 686 (1986). We also explained that Title IX requires a close connection between a plaintiff and a Title IX recipient. *Doe*, 971 F.3d at 558, 559 n.4. The text of Title IX supports our interpretation. *See* 20 U.S.C. § 1681. So, while I agree with the majority that this proceeding was education-related, I cannot join in the majority's cursory analysis of *Snyder-Hill v. Ohio State Univ.*'s impermissible expansion of Title IX law, *see* 48 F.4th 686, 707–09 (6th Cir. 2022) (expanding Title IX law to include a plaintiff class that bears an attenuated connection to a Title IX recipient); *see also id.* at 719–20 (Guy, J., dissenting), and the majority's adoption of *Snyder-Hill*'s construal of *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982). *Compare Snyder-Hill*, 48 F.4th at 707–09 *with North Haven*, 456 U.S. at 520–22 (explaining that employees of Title IX recipients can bring Title IX claims, not that members of the public at large can bring these claims); *see also North Haven*, 456 U.S. at 523–30 (explaining that the legislative history of Title IX supports that employees of Title IX recipients can bring a Title IX suit, not that a Title IX "person" is any member of the public). Title IX plaintiffs must have some connection to a Title IX recipient to bring a claim against that recipient. Doe has such a connection here, so we need not sign on to *Snyder-Hill*'s impermissible Title IX expansion, including a plaintiff class too far removed from the Title IX recipient.

discrimination.  *Jackson*, 544 U.S. at 176–78; *see also id.* at 173–74 ("Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment.").[15]

In turn, many Circuit Courts treat Title IX retaliation claims by analogizing them to Title VII retaliation claims.[16]  We do the same.  *See, e.g.*, *Goldblum v. Univ. of Cincinnatti*, 62 F.4th 244, 251 (6th Cir. 2023); *Bose*, 947 F.3d at 988–89.  If the claimant uses direct evidence to establish a prima facie case of Title IX retaliation, then the inquiry stops there, and the claim survives summary judgment.  *Goldblum*, 62 F.4th at 251.  Direct evidence "requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013).  However, when a plaintiff uses indirect evidence to show retaliation, then the *McDonnell Douglas* burden-shifting framework applies.  *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010); *Goldblum*, 62 F.4th at 251.

First, according to the burden-shifting framework, Title IX retaliation claimants must establish a prima facie case of retaliation, showing that: "(1) [the claimant] engaged in protected activity, (2) the funding recipient knew of the protected activity, (3) [the claimant] suffered an adverse education-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Goldblum*, 62 F.4th at 251; *see also Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2007) (explaining that the burden of proof at the prima facie stage is minimal).  *But see Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022) ("[T]he mere fact that some adverse action is taken after an employee engages in some protected activity will not always be enough for a prima facie case.").

---

[15]The Department of Education has since weighed in.  "No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [T]itle IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, . . . for the purpose of interfering with any right or privilege secured by [T]itle IX or this part, constitutes retaliation."  34 C.F.R. § 106.71(a).

[16]*See, e.g.*, *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1315 (10th Cir. 2020); *Austin v. Univ. of Or.*, 925 F.3d 1133, 1136 n.3 (9th Cir. 2019); *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020); *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002).

Second, if the claimant establishes a prima facie case, the burden shifts to the Title IX recipient to demonstrate legitimate, nonretaliatory reasons for its actions. *Goldblum*, 62 F.4th at 251 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Third, if the recipient meets its burden, the claimant may then refute the recipient's proffered reasons by showing that the reasons are merely pretext for unlawful retaliation. *Id.* (citing *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1132–33 (6th Cir. 2020)).

Because I agree with the district court that Doe failed to establish a prima facie case of retaliation, I focus only on the prima facie case, specifically the third and fourth prongs.[17]

IV.

a. Adverse Action

The majority categorizes Doe's adverse-action allegations in four ways: (1) the delay in scheduling the fourth hearing; (2) the failure to adequately prosecute JD; (3) the hearing panel and appeals board decisions; and (4) Chief Monroe's alleged interference with the Title IX proceeding. I will take each in turn and explain that, whether viewed in combination or in isolation, no reasonable juror would conclude that Doe has a genuine issue of material fact related to educational adverse action.

In the Title IX context, we define "adverse action" as something that would dissuade a reasonable person from engaging in protected activity related to education. *Gordon v. Traverse City Area Pub. Sch.*, 686 Fed. App'x 315, 320 (6th Cir. 2017); *see also Burlington North & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Goldblum*, 62 F.4th at 251; *Bose*, 947 F.3d at 987 (explaining that expulsion can be educational adverse action). None of the claimed adverse actions in this case would dissuade a reasonable person from engaging in UK's Title IX

---

[17]The parties do not dispute the first two elements of the prima facie case for Title IX retaliation: protected activity and knowledge. Doe engaged in two protected activities which UK knew of: (1) filing her federal lawsuit against UK and (2) "persever[ing] to a fourth sexual misconduct hearing."

procedure or from filing a federal Title IX suit.  We should not drum up adverse actions that do not exist.[18]

### i. The Delay in Scheduling the Fourth Hearing

Doe's evidence demonstrates that Doe herself caused or contributed to the delayed fourth hearing, and the evidence that she claims demonstrates retaliation is evidence of mistake at most. After the third hearing decision was reversed on June 9, 2015, Dr. Simpson reached out to Doe on July 29 to schedule a fourth hearing with the "goal . . . to schedule this hearing as soon as we can." Doc. 140-2, PageID#1995. Doe responded by requesting that "the process be suspended unless/until [JD] attempts to return to UK." *Id.* at 1996. Dr. Simpson and Doe exchanged a few more emails, resulting in Dr. Simpson's sending Doe an online, confidential poll to help determine Doe's August-availability.  But Doe did not respond to that poll.  Instead, her next communication relayed that she had retained new counsel and that she would need to check on her attorney's availability before proceeding with scheduling a fourth hearing.

Next, Doe's attorney sent a "Cease Direct Contact" letter stating that "we certainly object to the fourth hearing" but will participate to the extent necessary to find JD responsible. Doc. 140-3, PageID#2001. Then, when Doe filed this lawsuit on October 1, 2015, she requested vague injunctive relief "to be determined at trial." Doc. 1, PageID#11. Around the same time, another lawsuit was filed against UK—that one alleging that accuseds are not afforded enough due process. Doc. 8-1, pageID#116.  Faced with competing lawsuits, UK was stuck in a classic "catch-22" scenario.  And UK was left wondering if its Title IX procedure, itself, was constitutionally sufficient.[19]

---

[18]The district court discussed UK's proffered reasons as to why their actions were not retaliatory through the UAB's 23-page decision on Doe's appeal of the fourth hearing.  But it did so in dicta.  The ultimate holding is that Doe did not establish a prima facie case of Title IX retaliation because she did not adequately plead an adverse action. While erring on the education-related aspect, the district court still analyzed the prima facie case and what was "adverse" to Doe and how those adverse actions were not so adverse as to dissuade a reasonable person from engaging in protected activity.  In more dicta, the district court found no causal connection (the last prong of the prima facie case) between Doe's alleged adverse acts and protected activity.

[19]The majority claims that UK forfeited any argument based on the undisputed fact that UK faced a competing lawsuit at the time of Doe's lawsuit, but the record reflects otherwise.  UK filed a motion to consolidate the competing cases, *see* Doc. 8, PageID#114, and explained that, although factually distinct, the "complaints involve[d] common issues of law, namely, does [UK's] policy and procedure in the student disciplinary process

Only in response to UK's motion to dismiss did Doe explain what she was requesting as injunctive relief, stating that she did not seek to enjoin UK's Title IX hearing process. The day after Doe responded, UK emailed Doe's attorney requesting to schedule the fourth hearing. Doe's attorney told UK that after she contacted Doe's mental health provider, she would have an answer on Doe's availability. She also requested to be updated if JD's counsel provided UK with potential dates. Neither party followed up.

To be sure, the district court admonished UK for not scheduling the fourth hearing, but the district court did so with general disdain for UK's Title IX process, lamenting that those accused of sexual assault were consistently denied adequate due process. Doc. 12, PageID#154–55, 154 n.2, 156. The district court also highlighted that UK had delayed the process *before* Doe filed this lawsuit, *id.*, during a time when Doe "certainly objected to [having] the fourth hearing." Doc. 140-3, PageID#2001. Clearly, then, UK's pre-lawsuit delay could not have been in retaliation to the lawsuit, and Doe herself objected to even having the fourth hearing.

After the admonishment, UK attempted to schedule the fourth hearing some time between September 15 and October 15, 2016. The hearing was scheduled for October 19, 2016, based on both Doe's and JD's counsel's schedules. But, on the day of the fourth hearing, it was rescheduled given the due process concerns that Professor Lawson had regarding the use of Doe's recorded testimony and what impact the recorded testimony might have on the objectivity of the hearing panel. Professor Lawson had previously granted Doe's request to use her recorded testimony from the third hearing in lieu of live testimony. To prevent another appeal (and potential reversal) on due process grounds, Professor Lawson decided that a continuance was appropriate. The fourth hearing was ultimately held on January 10, 2017.[20] This is not evidence of retaliatory adverse action.

---

comply with constitutional due process guarantees." Doc. 8-1, PageID#119. UK explained that it was "squarely in the middle of competing student interests and harmonizing [its] duties under the Constitution, Title IX[,] and the Department of Education directives." *Id.* This motion was denied as moot after a similar motion in the competing case was also denied. Doc. 11, PageID#147. Although absent from its motion for summary judgment, this argument appears below, meaning that the argument was *not* born on appeal. Therefore, it was not forfeited.

[20]The fourth hearing was rescheduled in November, as well. Like her initial complaint, in which Doe claimed that the fourth hearing was delayed because of JD's community college football schedule, Doc. 1, PageID#9, Doe's operative complaint implied that the fourth hearing's November-rescheduling was also a result of

Once more, we must look to "the record taken as a whole," *Matsushita Elec.*, 475 U.S. at 587, and the entirety of the record demonstrates that this delay can hardly be viewed as retaliatory. At almost every step, Doe herself contributed to it.[21] At most, this delay was mistaken, which should not amount to adverse action.

### ii.  The Failure to Adequately Prosecute JD

As I read the majority opinion, the majority inserts itself as another level of appellate review *within* UK's Title IX process, employing a sort-of "best practices" standard and reviewing how UK presented Doe's case at the fourth hearing de novo. "A school is an academic institution, not a courtroom or administrative hearing room." *Bd. of Curators of Univ. of Missouri*, 435 U.S. at 88. Therefore, school disciplinary proceedings do not require the formalities of a courtroom. *Flaim*, 418 F.3d at 635. And we give deference to how a school conducts its disciplinary hearings, *Davis*, 526 U.S. at 648–49; *New Jersey*, 469 U.S. at 342–43 n.9, especially when the record reflects that the parties involved were afforded due process. *Goss*, 419 U.S. at 580; *Univ. of Cincinnati*, 872 F.3d at 399.

To the majority, according to this new best-practices standard and a de novo review of the fourth hearing, Dean Kerhwald's representation of Doe at the fourth hearing was retaliatory. Pointing to the fact that he did not object at all during the fourth hearing, the majority takes Doe's view that Dean Kerhwald must have been retaliating against her.

---

JD's community college football schedule. Doc. 57, PageID#371. Doe seems to have abandoned this bald and conclusory allegation on appeal. In turn, neither Doe nor the majority takes issue with the November rescheduling. But why not? If this delay was retaliatory, then the November-rescheduling ought to count as evidence of the supposedly retaliatory delay. Every other possible piece of evidence for the delay was construed that way. It is telling that neither Doe nor the majority views the November-rescheduling as retaliatory.

[21]This fact renders inapposite *Watford v. Jefferson County Public Schools*, 870 F.3d 448 (6th Cir. 2017). There, in the Title VII context, a collective bargaining agreement (CBA) stipulated that grievance proceedings would be held in abeyance upon filing an EEOC charge. *Id.* at 453. In turn, employees were left with the choice of filing a grievance or an EEOC charge *because* of the CBA. The employees themselves did not contribute to the adverse action. However, the employees' union contributed to it, and we said that they could be liable under Title VII. *Id.* The *Watford*-panel further explained that employees were faced "with a false binary," choosing between filing a speedy, extrajudicial grievance and filing an EEOC charge. *Id.* at 454. Requiring this false binary was an adverse action. *Id.* at 454–55. Doe was faced with no such choice. When presented with opportunities to schedule the fourth hearing earlier than January 10, 2017, the record clearly reflects that Doe herself contributed to the very delay that she claims was retaliatory.

In support of this argument, Doe cites to a case from the U.S. District Court for the District of Maryland.  There, Morgan State University officials did not issue a second no-contact order against the assailant, which led to further harassment of the accuser.  *Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 573, 586 (D. Md. 2021).  That inaction, according to the Maryland district court, could be considered an adverse action by a jury because it led to further harassment.  *Id.* at 586.  Here, the alleged inaction did not put Doe in harm's way, and it was not related to giving the accused access to Doe.  Dean Kerhwald, while presenting the case that JD violated UK policy, exercised discretion in choosing how to represent that JD had committed a violation of that policy.  *See Tinker*, 393 U.S. at 507.**[22]**  Based on this record, the fact that Dean Kerhwald did not object during the fourth hearing cannot be considered retaliatory adverse action because his entire representation of Doe would not dissuade a reasonable person from engaging in the Title IX process at UK or from filing a federal Title IX action.

Doe and the majority also take issue with the facts that Officer Sizemore did not testify at the fourth hearing and that the parties stipulated to Officer Scott's testimony.  A few things are relevant here.  Officer Sizemore testified at one of the other three hearings, Doc. 140-1, PageID#1985, meaning that she testified in person only once throughout this entire process.  And, by her own account, everything that she knew, factually, was contained in her police report which was read into the fourth hearing's record.  While Sizemore could have testified to her opinions about the matter beyond her police report, JD also forfeited the opportunity to cross-

---

**[22]**Dean Kerhwald opened his argument in support of Doe by explaining that the case will come down to whether the panel views the sex acts between Doe and JD as consensual or as sexual assault.  Doc. 131-22, PageID#1712.  Then, per Doe's attorney's request, he directed the hearing officer to play Doe's recorded testimony from the third hearing.  *Id.* at 1714–16.  After Doe was cross-examined, Dean Kerhwald was given the opportunity to redirect with Doe.  *Id.* at 1722.  He did so, directing Doe to point out inconsistencies in JD's version of events and to highlight the allegedly forceful nature of Doe's and JD's sexual encounter.  *Id.*  Dean Kerhwald then questioned Doe's witness on direct examination, allowing the witness to share her version of what she saw her roommate (Doe) go through on the day in question.  *Id.* at 1722–24.  On redirect examination of Doe's witness, Kerhwald introduced evidence of Doe's trauma through a suicide note by having the hearing officer read Officer Sizemore's police report into the record.  *Id.* at 1726–27.  In his closing argument, Dean Kerhwald argued that JD initiated contact with Doe and that the police report, the texts, the videos, and the pictures support Doe's version of events.  *Id.* at 1745.  He argued that Doe's demeanor on video was consistent with her claim that the sexual encounter was not consensual and that her version of events was more consistent than JD's.  *Id.* at 1746.  Kerhwald downplayed arguments by JD's attorney.  *Id.* at 1747.  He stated that Doe did not work herself up after talking with her roommate and mother, but, instead, Doe immediately came to the conclusion that this was not consensual.  *Id.* at 1746–47.  And he argued that evidence of consent in the past is not evidence of consent to the immediate situation.  *Id.* at 1746.  He closed by arguing that the entirety of the evidence, including the demarcations and contusions on Doe's body along with her suicide note, demonstrate that this sexual encounter was not consensual.  *Id.* at 1748.

examine Sizemore about her opinions in her absence. Her absence was neither adverse nor retaliatory.

To the majority's concern that Officer Sizemore's presence at the fourth hearing was requested with inadequate notice, UK's Title IX Office was sloppy. But that does not mean that the late request was retaliatory. The record reflects that the presence of both officer-witnesses was requested on the same day, Doc. 140-21, PageID#2108; Doc. 140-6, PageID#2033, Officer Sizemore's by Doe, and Officer Scott's by JD. The Title IX Office contacted the UK police department on Friday, January 6, 2017, asking Captain Webb if both officers could attend the hearing. Captain Webb was out of the office that day and did not respond until Monday. He responded that both officers were unavailable. Chief Monroe made accommodations for Officer Scott to attend, allowing Scott to skip training, and Monroe confirmed that Sizemore had childcare issues on the day of the hearing so that she could not attend. Monroe's actions aside— more on that later—this cannot be deemed retaliatory action. The Title IX Office should have requested the witnesses earlier, but the requests were treated identically.[23] That is not evidence of retaliatory adverse action.

As to Officer Scott's stipulated testimony, the fact that it was read into the record is not evidence of retaliatory action. He was a witness called by JD. By Doe's and the majority's reasoning on this point, the fact that UK allowed JD to defend himself and call witnesses at the fourth hearing means that UK must have been retaliating against Doe.

In its response to Doe's appeal of the fourth hearing, UK called Officer Scott's testimony "inconsequential and non-substantive," Doc. 140-39, PageID#2210, but the majority claims that Officer Scott's stipulated testimony bolstered JD's credibility. The stipulation said:

> Officer Scott, if he was called as a witness today, would testify that . . . [JD] had called him that afternoon after receiving these text messages and had told him that these allegations had been made against him. . . . Officer Scott would testify that he told [JD] "I'll make a phone call to the police department. You need to go over there and tell them your version of what happened." So he advised him to go over, and I believe Officer Scott called the police department and told them that he was coming. Based on that, [JD] went directly to the police department.

---

[23]Per UK Title IX policy, the request could have been made up to six business days before the hearing.

Doc. 131-22, PageID#1739. Obviously, this stipulated testimony does nothing to bolster JD's credibility. The testimony corroborates that JD called Officer Scott after the incident, but it does not get at whether the hearing panel would believe JD over Doe as to whether the sexual encounter was consensual. And, again, this was testimony that JD requested in mounting a defense.

Next, both Doe and the majority take issue with UK's position during Doe's appeal of the fourth hearing. But both fail to recognize that UK's role changes on appeal. After a hearing panel's decision is appealed, the student code of conduct demonstrates that UK no longer acts as the prosecutor of the case. Doc. 140-11, PageID#2073; *see also* Doc. 140-5, PageID#2018–19.[24]

Compare UK's role at Title IX hearings versus on appeal. At the Title IX hearing, UK assigns a representative to "present the case on behalf of the University." Doc. 140-11, PageID#2071. "The rights of this representative shall be [the] same as those of the complaining witness." *Id.* Whereas, on appeal, the student code of conduct does not mention a UK representative who takes up the case for a student appealing a hearing panel's decision. Instead, UK has the ability to file a response to the appeal. *Id.* at 2074. Those who may appeal a hearing panel's decision are the "respondent or complaining witness," not the university. *Id.* at 2073. In other words, UK's role on appeal is akin to a third-party's role with the ability to respond to the appeal itself.

Based on this record, UK could have made different choices in presenting Doe's case. But, at most, UK's missteps are just that and give no reason to construe them as retaliatory. Even if we would have presented Doe's case differently, UK was not retaliating against Doe.

### iii. Hearing Panel and Appeals Board Decisions

According to the majority, Doe has pointed to specific acts of the hearing panel and appeals board that meet our adverse action standard. This again ignores any amount of deference we are to give schools when reviewing their disciplinary proceedings. *See Flaim*, 418 F.3d at

---

[24]In UK's response to Doe's appeal, it refers to itself as "the University Complainant." Doc. 140-39, PageID#2205. Admittedly, this identifier is misleading and confusing. But a review of UK's Title IX appellate process makes clear that the University does not retain an adversarial role on appeal. Instead, it is a third party with the capability of filing a "response" to any appeal. Doc. 140-11, PageID#2074; Doc. 131-29, PageID#1836.

635; *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. Dec. 6, 2016). On top of that, the majority tacitly accepts Doe's conclusory speculation about the hearing panel's and the appeals board's reasoning.

For starters, Doe and the majority take issue with two procedural decisions that are apparently attributable to the hearing panel: (1) the impeachment using Doe's recorded testimony from the first hearing and (2) questioning about monetary incentives. But the hearing panel had nothing to do with either question. The panel's only role in a Title IX hearing is to weigh the evidence and determine whether the respondent violated the student code of conduct. Doc. 140-11, PageID#2072. According to the code, "[a]ll questions of law, whether substantive, evidentiary, or *procedural*, shall be addressed to and ruled upon by the Hearing Officer." *Id.* (emphasis added). So, the real complaint is not with the panel but with Professor Lawson.

At the fourth hearing, Doe claimed that she "didn't call [JD]" and "didn't know he had a second girlfriend." Doc. 131-22, PageID#1720. Doe was then impeached with recorded testimony from the first hearing, in which she stated that she called JD after the alleged sexual assault, stating "I didn't want to be his second girlfriend." *Id.* at 1721. That testimony was previously thrown out as inadmissible, but it was inadmissible "in any later proceeding *against JD*." Doc. 140-30, PageID#2161 (emphasis added). The UAB did not categorically exclude evidence from the first hearing for any further use. Doe also claims that this impeachment and another cross-examination question about her financial motivations in suing UK are evidence of retaliatory action on behalf of the hearing officer, Professor Lawson.**25**

Both questions were relevant to Doe's credibility and motivations. In a courtroom they might have been met with more scrutiny, but we should be hesitant to second-guess an educational proceeding with the level of scrutiny that Doe and the majority would have us employ. *Davis*, 526 U.S. at 648; *Flaim*, 418 F.3d at 635.**26** When a hearing officer commits

---

**25**The financial motivation question was met with an objection by Doe's attorney. Ms. Howell stated, "I think that's asking for a client for legal advice. I mean she's not—she's not an attorney. She can't answer that question." Doc. 131-22, PageID#1719. So, Doe's counsel was not objecting because the question engendered bias or retaliation but for an attorney/client relationship concern.

**26**Relatedly, Doe claims that Professor Lawson had "animus" towards accusers in Title IX proceedings because he advocated for a higher evidentiary burden in sexual misconduct hearings. Professor Lawson did have

clear procedural irregularities, there arises an inference of Title IX discrimination. *Doe v. Oberlin Coll.*, 963 F.3d 580, 586–87 (6th Cir. 2020); *Rossley v. Drake Univ.*, 979 F.3d 1184, 1193 (8th Cir. 2020); *Menacker v. Hofstra Univ.*, 935 F.3d 20, 35 (2d Cir. 2019). But Professor Lawson did not engage in clear procedural irregularities in this proceeding.[27]

In fact, Professor Lawson made several procedural rulings in Doe's favor, granting her requests to attend the hearing remotely and to use recorded testimony from the third hearing. Doc. 131-1, PageID#1400, 1404. And in correspondence with Doe's then-attorney, Elizabeth Howell, Professor Lawson explained his desire to get the process right in this hearing. He followed through on that desire by following UK Title IX procedures.[28]

Next, Doe and the majority take issue with the hearing panel's and the UAB's substantive reasoning and decisions. In the majority's view, Doe claims that the hearing panel's decision rested on thin inconsistencies and innocuous details. The fourth hearing panel hinged its decision on credibility and plausibility, finding in favor of JD. Doc. 140-34, PageID#2182. The panel—after viewing surveillance footage—found inconsistencies in Doe's rendition of events, stating that contrary to Doe's assertion that JD was already in the lobby of her dorm she "actually had to go outside to retrieve him." *Id.* The panel, after hearing both testimonies, found it implausible that Doe could not have known that JD had disrobed in her dorm room, given the small size of her room. The panel also questioned why Doe would change her entire outfit in

---

due process concerns regarding UK's Title IX hearings, but those overall due process concerns cannot be considered retaliatory against Doe. Doe also construes Professor Lawson's reference to her "so-called" suicide note as hostile towards her. Hostility towards a complainant in a Title IX proceeding is not permissible. But Doe's assertions against Professor Lawson and his perhaps unfortunate choice of words are nothing more than conjecture. Conclusory assertions will not give rise to a genuine issue of material fact as to whether Lawson was hostile to Doe.

[27]Doe cites *Moe v. Grinnell Coll.*, No. 4:20-cv-00058-RGE-SBJ, 2021 WL 5331774 (S.D. Iowa June 2, 2021), for the proposition that Professor Lawson, as the hearing officer, retaliated against Doe during the fourth hearing. Doe's reliance on *Moe* is misplaced. At a later disposition in that case, the Southern District of Iowa denied Grinnell College summary judgment, explaining that the adjudicator in that Title IX proceeding deviated from Title IX procedure by finding the *accused* party guilty of *uncharged* conduct while using biased perspectives and stereotypes against those accused of sexual assault. *Moe v. Grinnell Coll.*, 556 F. Supp. 3d 916, 932 (S.D. Iowa 2021). Here, unlike the adjudicator in *Moe*, Lawson did not deviate from Title IX procedure and did not use stereotypes against either party. Moreover, Professor Lawson's role did not include an adjudicating responsibility, whereas the *Moe*-officer had that responsibility.

[28]Moreover, that financial-motive question had little impact on the fourth hearing panel's decision. The panel's conclusion hinged on credibility and plausibility, *not* Doe's monetary motives. Doc. 140-34, PageID#2182.

front of her alleged assailant when she testified that he only removed her pants. And the panel took issue with the fact that Doe was seen on surveillance video talking with JD directly after the alleged sexual assault after she signed him out of her dormitory. The subsequent text messages between Doe and JD did not line up with Doe's version of events, according to the panel. Moreover, the panel explained that during the fourth hearing Doe testified that she did not know JD had a girlfriend at the time of the incident. But the panel heard recorded testimony in which Doe "stated not being a second girlfriend," giving the panel even more concern as to Doe's credibility. *Id.* The panel also looked at the hospital reports and photos concluding that the evidence did not clearly show "biting, restraining, or alleged force." *Id.* at 2181. While we do not have the photos in the record, we have the hospital report, which categorized Doe's three "thin" "scratches" on the "back of [her] neck and shoulder" as an abrasion, tenderness, and abrasion/tenderness, respectively. Doc. 131-1, PageID#1575, 1577. To call the hearing panel's decision in JD's favor an adverse action is to conclude that any unfavorable outcome is an adverse action. Doe has not pointed to any evidence, besides the outcome, that requires us to scrutinize the panel's reasoning here.

Then, the UAB reviewed the fourth hearing pursuant to UK's Title IX appeals process and issued a 23-page opinion detailing why it denied Doe's appeal. The UAB reviewed for reversible procedural error and issues of new information. The hearing panel's factual findings were reviewed for clear error while the panel's legal conclusions were reviewed de novo. Doe points to the fact that the UAB adopted positions that were averse to her in denying her appeal, and claims retaliation. In every adversarial proceeding, one party's arguments prevail over the other party's arguments. If this is retaliation, then in every proceeding the losing party must have been retaliated against by the adjudicating entity.

Both Doe and the majority could have made this analysis easier by calling Doe's claim with respect to the outcome of the entire proceeding what it really is: a Title IX erroneous-outcome claim. Under that theory of liability, the plaintiff must prove that a Title IX recipient reached an erroneous outcome in a Title IX hearing because of the plaintiff's gender. *Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018). There are two elements to a plaintiff's erroneous-outcome claim. The plaintiff must: (1) "cast some articulable doubt" on the Title IX

proceeding's accuracy and outcome and (2) demonstrate a particularized causal connection between the flawed outcome and gender bias. *Id.* (quoting *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018)). But those very elements are likely why Doe did not bring an erroneous-outcome claim in the first place—based on this record such a claim would not survive a motion to dismiss, let alone a motion for summary judgment. Here, the record clearly reflects that UK denied JD due process by violating its own procedural rules in the first three hearings. To correct course and provide both parties due process, is not to retaliate against Doe.

### iv.  Chief Monroe's Interference

UK cannot be vicariously liable for Chief Monroe's actions under some theory of respondeat superior. We do not recognize vicarious liability or cat's paw liability in the Title IX context. *Bose*, 947 F.3d at 989–91 (following *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 273, 290–91 (1998), and holding that cat's paw liability does not apply in Title IX cases). So, even though Chief Monroe is a member of the broader UK community, his actions are not imputed to UK for Title IX purposes. "[R]ecipient[s] of federal funds may be liable in damages under Title IX only for [their] own misconduct." *Id.* at 990 (citation omitted); *see also Gebser*, 524 U.S. at 288, 290–91 (explaining that only "appropriate person[s]" who can rectify violations of Title IX can bring about liability for a Title IX recipient). In other words, only officials of the Title IX recipient entity who may take corrective action to end Title IX discrimination may bring about Title IX liability for the recipient. *Gebser*, 524 U.S. at 290; *Bose*, 947 F.3d at 990. Chief Monroe is not a Title IX decision-maker and, therefore, is not an appropriate person who could bring about Title IX liability for UK.

But purporting to expand our Title IX law to include deliberate-indifference-to-retaliation claims, on this record the majority has created something else: a deliberate-indifference-to-a-duty-to-investigate claim. Certainly, this awkward identifier is more accurate than calling Doe's claim "deliberate indifference to retaliation." The majority recognizes this, stating that the evidence raises a question as to the adequacy of UK's investigation, not gender-based retaliation. *Contra Davis*, 526 U.S. at 644 ("[B]oth the 'deliberate indifference' standard and the language of Title IX narrowly circumscribe the set of parties whose known acts of *sexual harassment* can trigger some duty to respond on the part of funding recipients." (emphasis added)). Supreme

Court and Sixth Circuit precedent dictate that Title IX discrimination cases must be tethered to gender-based discrimination. *See, e.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694–709 (1979) (creating an implied private right of action to sue under Title IX for gender-based discrimination); *Gebser*, 524 U.S. at 292–93; *Bose*, 947 F.3d at 989–90 (applying Title IX to a claim of sexual harassment). The majority expands our Title IX law to include a claim untethered to gender-based discrimination. Doe has not shown that Monroe acted with gender-based retaliatory animus towards her, but under the majority's new rule, that does not matter. I proceed by analyzing the record under the majority's new deliberate-indifference-to-a-duty-to-investigate claim, showing that even under this new rule, there is no adverse action attributable to UK based on Chief Monroe's conduct.

Doe presents evidence in the record that she claims suggests that Chief Monroe acted to interfere with the fourth hearing by preventing Officer Sizemore from testifying. Doe relies on Officer Sizemore's speculation that she was prevented from even attending the hearing. The record clearly reflects that Sizemore had childcare issues on the day of the fourth hearing. *See* Doc. 140-1, PageID#1986–87; Doc. 131-34, PageID#1905–06. But Sizemore claims that Chief Monroe used her childcare issues as pretext for preventing her from attending the hearing and even having any knowledge of it. Monroe had called Sizemore to his office for a meeting during which he asked her if she had childcare issues and could not be somewhere if she had to be. She answered that she did have childcare issues. After Sizemore found out that Chief Monroe had not been entirely clear with her, she was "extremely upset." Doc. 140-27, PageID2137. In turn, Sizemore speculated that Chief Monroe's intentions were not innocent during that meeting, but she did not tell *anyone* about her speculation until this litigation. Sizemore's claims amount to no more than conjecture.

At most, this evidence creates a quasi-genuine issue of fact regarding whether Monroe prevented Sizemore from attending the hearing, *not* that he had retaliatory animus towards Doe based on her gender. *See Jackson*, 544 U.S. at 174 (explaining that Title IX retaliation is retaliation on the basis of gender). Here, however, the majority claims that UK did not adequately investigate the alleged interference. But Martha Alexander, the then-Deputy Title IX Coordinator did investigate those claims.

Doe first became aware of Monroe's alleged interference via two anonymous, encrypted emails that her then-counsel would not share with UK. The emails were received on January 19, 2017, nine days after the fourth hearing. Doe's attorney relayed the allegations, but not the emails, to Alexander. Alexander called Sizemore, and rather than merely confirming that Alexander had childcare issues, she asked Sizemore whether someone told her not to attend the fourth hearing. Doc. 140-1, PageID#1990. Sizemore answered no, but Sizemore later said that she thought of her conversation with Chief Monroe during that call.[29] That thought remained unspoken though, and Sizemore did *not* relay that information to Alexander.

Later, UK directly received another anonymous, encrypted email, containing substantially the same allegations as the emails that Doe's attorney had received.[30] It read, "reassure her[] that she is not in trouble," insinuating that Chief Monroe would retaliate against Sizemore for telling the truth. Doc. 140-37, PageID#2195. But, as part of standard practice, during their phone call, Alexander had already reassured Sizemore of her protections for speaking the truth. Alexander told Sizemore "specifically about the University's policy against retaliation." Doc. 140-46, PageID#2476. And UK did investigate after receiving the third email by having Chief Monroe account for a timeline of events leading up to the fourth hearing, concluding that no more investigation was required. Because the emails were anonymous and encrypted, there was no complainant to follow-up with regarding the allegation of interference. And UK could not respond to information that it did not have: Sizemore's interpretations of her conversation with Chief Monroe. Therefore, that interpretive speculation is immaterial to the majority's new Title IX claim.

Even under the majority's new deliberate-indifference-to-a-duty-to-investigate claim, this alleged interference and supposed failure to investigate is not an adverse action for the prima facie stage. And we should not second-guess an educational institution's reasonable investigation. *See Tinker*, 393 U.S. at 507 ("[T]he Court has repeatedly emphasized the need for

---

[29]Clearly, Sizemore understood the nature of the call—that Alexander was investigating something surrounding the fourth hearing.

[30]That the appeals board was not informed of the third email is immaterial. It would not have added anything new to what the UAB already had because the email contained nearly identical claims.

affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.").

Assuming, for the sake of argument, that these facts amount to deliberate indifference to retaliation, Doe's claim still fails. On this score, *Bose v. Bea*, 947 F.3d at 993, is helpful. In that case, the plaintiff did not pursue a deliberate-indifference-to-retaliation claim on appeal, forfeiting it instead. *Id.* However, the *Bose*-majority posed three helpful questions to guide an actual deliberate-indifference-to-retaliation claim. *Id.* Who would be an appropriate person or entity to contact regarding the retaliation? *Id.*; *see also Gebser*, 524 U.S. at 289. Was the appropriate person or entity adequately informed of the retaliation? *Bose*, 947 F.3d at 993. If so, was the response "clearly unreasonable in light of" being adequately informed? *Id.* (citing *Williams ex rel Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 367–68 (6th Cir. 2005) (internal quotation marks omitted)); *see also Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (explaining that Title IX recipients are liable for damages when they "intentionally act[] in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment").

The answer to the first question is not disputed. Martha Alexander was an appropriate person to notify of alleged retaliation. Doe's claim fails on the last two questions. Alexander was not adequately informed, meaning that Doe presented only speculation of interference and that Sizemore never relayed to Alexander that she thought Monroe was interfering. In other words, Alexander was presented with anonymous speculation and was later presented with an incomplete account from Sizemore. But assuming she was adequately informed, Alexander responded clearly reasonably. She followed up with Sizemore after being presented with anonymous allegations (not yet having copies of the anonymous, encrypted emails), and she later followed up with Monroe when UK was sent another anonymous email containing virtually the same allegations as the previous ones. Alexander, on behalf of UK, did not ignore a duty to respond, and she did not violate UK's Title IX procedures. When Title IX recipients act promptly and reasonably to alleged malfeasance, then the recipients are *not* deliberately indifferent. *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 364 (6th Cir. 2012). Construed as a deliberate-indifference-to-retaliation claim, Doe's claim fails.

b.  Causation

Although the district court's holding did not directly address the causation element of a Title IX retaliation prima facie case, rendering anything from the district court related to causation dicta, the majority endeavors to explain that Doe has proven as much.  I agree with the majority's explanation of our Title IX causation standard.  *See Fuhr*, 710 F.3d at 675; *Bose*, 947 F.3d at 988.  But I cannot agree that the classic "before-and-after" comparison establishes causation in this case.

First of all, the delay was caused by factors that are akin to intervening causes.  *See Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 450 (6th Cir. 2020) ("[A]n intervening cause between protected activity and an adverse employment action dispels any inference of causation.").  Moreover, when the plaintiff contributes to the delay, we are supposed to consider that contribution as an intervening event that breaks the chain of causation.  *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 472 (6th Cir. 2012).  Here, we have many intervening causes of the delay between Doe's initial filing of this suit and her "persever[ing]" to a fourth disciplinary hearing.  To name a few, Doe stated that she did not want a fourth hearing, and her attorney stated the same; Doe did not respond when UK tried to schedule a hearing; and Doe filed for vague injunctive relief.  The record also shows that UK had delayed the fourth hearing *before* Doe filed this suit.  Meanwhile, UK faced competing lawsuits: one claimed UK did not give accuseds enough due process and the other claimed accuseds received too much.  No causal connection exists regarding the delay.

Regarding the alleged failure to prosecute JD and the procedural and substantive reasoning of the hearing panel and UAB, the context-specific nature of our causation inquiry is fatal to proving causation here.  *See Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007).  And a plaintiff's contributions to alleged adverse action tend to negate causation.  *Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013); *Wasek*, 682 F.3d at 472.  Doe chose to attend the fourth hearing remotely.  She and her attorney did not stay for the entire hearing.  Doe stipulated to using her recorded testimony from the third hearing as her direct testimony in the fourth.  This is not to say that there is anything wrong with Doe's actions.  She simply made decisions regarding how best to engage with the UK Title IX process.  And the record reflects that she was

afforded due process. Of course, Doe takes issue with certain procedural and evidentiary rulings, but she has not put on evidence demonstrating that those rulings contravened UK's Title IX procedure, nor were they violative of her due process rights. On top of that, Doe has not proffered evidence suggesting that Kerhwald's representation changed from one hearing to the next. Instead, she points solely to the outcome of the fourth hearing as evidence that Kerhwald must not have presented her case sufficiently.[31]

"What changed from the first three hearings to the fourth?" the majority asks. Yes, Doe filed this lawsuit. But the record reflects that after three hearings in which JD was denied due process, in the fourth due process was provided to both parties. The due-process-change is dispositive and cuts off any causal connection between this suit and supposed retaliation.

Finally, Doe's argument that causation exists between Chief Monroe's alleged interference and Doe's protected activity is foreclosed by *Bose v. Bea*, 947 F.3d at 989. We do not recognize vicarious liability in the Title IX retaliation context. *Id.* And UK's investigation was not clearly unreasonable. It is immaterial that UK did not relay to Doe and her attorney that UK had received another anonymous, encrypted email just as it is immaterial that the UAB did not receive the same. The email was from the same email-encryption service, and it contained virtually the same allegations, i.e., it added nothing new to the equation. *Compare* Doc. 140-32, PageID#2176 *with* Doc. 140-37, PageID#2195. Causation does not exist on this record. To conclude otherwise is to rely almost entirely on conclusory and speculative assertions. In the end, Doe and the majority find causation simply because Doe faced an adverse outcome at the fourth hearing and on appeal. That is not enough.

V.

If a Title IX retaliation claim can make it past the prima facie stage based on conjecture, speculation, and assumptions akin to a conspiracy theory, then we should do away with this stage of the *McDonnell/Douglas* burden-shifting framework altogether and always assume it is met. I

---

[31]On appeal, as mentioned, UK's role was not the same. And the majority's assumption that UK represented Doe through JD's three appeals is not supported by the record. UK—through Dean Kerhwald—filed responses to JD's appeals, *see, e.g.*, Doc. 140-30, PageID#2163, but this does not mean that UK had the same adversarial role supporting Doe as it did before each hearing panel.

would affirm the district court's grant of summary judgment based on Doe's failure to establish an adverse action attributable to UK.  Because the majority sees it differently, I respectfully dissent.